# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| )<br>)<br>JO SPENCE )<br>710 Belmont Bay Drive )<br>Woodbridge, VA 22191 )<br>(571) 288-6092(c), )<br>)<br>_Plaintiff,_ )<br>)<br>v. )<br>)<br>UNITED STATES DEPARTMENT OF )<br>    VETERANS AFFAIRS, )<br>810 Vermont Avenue, N.W. )<br>Washington, DC  20420; and )<br>)<br>ROBERT WILKIE, in his official capacity as )<br>    Secretary of the United States )<br>    Department of Veterans Affairs, )<br>810 Vermont Avenue, N.W. )<br>Washington, DC  20420, )<br>)<br>_Defendants._ )<br>_____ ) | Case: 1:19−cv−01947<br>Assigned To : Boasberg, James E.<br>Assign. Date : 6/28/2019<br>Description: Employ. Discrim. (H−DECK) |

## **COMPLAINT**

Plaintiff Jo Spence, _pro se_ hereby files this action against Defendants the

United States Department of Veterans Affairs (hereinafter referred to as the "Agency"

RECEIVED

JUN 2 8 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbi

or the "VA") and Robert Wilkie, in his official capacity as the Secretary of the VA, and alleges the following:

## NATURE OF ACTION

1.   Plaintiff offers herein a civil action which includes causes of action arising under the Whistleblower Protection Act of 1989 (WPA), 5 U.S.C. section 2302, Title VII of the Civil Rights Act of 1964 , 42 U.S.C. 2000e-16, the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. 631, 633a, and the Department of Veterans Affairs Whistleblower Protection Act of 2017, P.L. No. 115-41 (6/3/17).

2.  Plaintiff challenges the personnel actions taken against her by the Agency on the basis of Plaintiff's race, sex and age.

3.  Plaintiff challenges the personnel actions taken against her by the Agency in retaliation for Plaintiff's disclosure of information to her superiors, the VA Office of Inspector General (OIG) and the Office of Special Counsel (OSC) which she reasonably believed evidenced a gross waste of funds and an abuse of authority.

4.  Plaintiff challenges the personnel actions taken against her by the Agency in retaliation for Plaintiff's exercise of her right to file a complaint and because she cooperated with or disclosed information to the Inspector General and the Special Counsel.

5.  Plaintiff challenges the deceptive tactics used by the Agency which interfered with Plaintiff's right to compete for employment.

6.   Plaintiff challenges the preferences and advantages not authorized by law, rule, or regulation given to employees from outside the Agency who were selected for GS-15 Trial Attorney positions intended for internal Agency attorneys.

7.   Plaintiff challenges the Agency's harassment of her which interfered with Plaintiff's ability to perform work and created a hostile work environment.

8.   Plaintiff challenges the Agency's termination of her employment without the requisite approval of the Special Counsel;

9.   Plaintiff asserts that her whistleblower complaints and disclosures and her EEO activity triggered a barrage of discriminatory and retaliatory behavior towards her by her supervisors  which included numerous unwarranted discipline-based and performance-based actions issued to Plaintiff simultaneously, failure to timely approve Plaintiff's use or lose leave request, a downgraded performance evaluation, denial of a performance award and promotion opportunities, a three-day suspension, exclusion from meetings, increased work pressure and change in duties, denial of Plaintiff's request to change her telework schedule, denial of Plaintiff's requests for transfer, failure to respond to Plaintiff's requests for information and/or assistance, and removal of Plaintiff from employment with the Agency.

10.   Plaintiff filed a mixed-case appeal with the Merit Systems Protection Board which issued a decision in favor of the Agency that became final on May 31, 2019.

11.  Plaintiff exhausted administrative remedies for all of her Title VII and whistleblower claims prior to filing this civil action in the U.S. District Court for the District of Columbia.

12. Plaintiff is seeking damages against Defendants for Defendants' violations of the Whistleblower Protection Act of 1989, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Department of Veterans Affairs Accountability and Protection Act of 2017.

## JURISDICTION AND VENUE

13.  This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. section 1331 (federal question or statute), 5 U.S.C. section 7702 (actions involving discrimination), and 5 U.S.C. section 7703 (mixed cases).

14.  Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(e)(1)(A), because Defendants are an agency and officer of the United States and because the Agency is located in Washington, DC.

## PARTIES

15.  Plaintiff, an attorney for over 32 years, is a resident of Virginia. Plaintiff resides at the address set forth in the caption of Plaintiff's Complaint.

16.  Defendant the United States Department of Veterans Affairs is a federal agency headquartered in Washington, DC.

17.  Defendant Robert Wilkie is sued in his official capacity as Secretary of the United States Department of Veterans Affairs.

### Statement of Facts

18.  Plaintiff was hired by the Department of Veterans Affairs through a competitive excepted service appointment as a General Attorney (Contract) on April 1, 2007.

19.  Plaintiff served continuously as a Senior Attorney from April 2007 until her removal in October 2018.

20.  At the time of Plaintiff's removal, Plaintiff was a GS-14 General Attorney (Contract) and had practiced law for over 32 years.

21.  During her tenure at VA, Plaintiff received numerous positive performance evaluations, awards and recognitions including an "Outstanding" performance evaluation in December 2016 following her supervisor's recommendation that Plaintiff be given a significant contribution award.

22.  During her tenure at VA, Plaintiff was revered and respected by her colleagues, clients, other Agency attorneys, personnel from VA offices not associated with the Office of General Counsel (OGC), and personnel from other agencies.

23.  During her tenure at VA, Plaintiff received positive feedback on a regular and continuing basis from clients and others within the Agency who were recipients of Plaintiff's verbal and/or written legal advice and guidance.

24.  Plaintiff's 2017-2018 Performance Assessment which was submitted by Plaintiff to her supervisors prior to her removal, included seven pages of feedback

from Plaintiff's clients, VA attorneys and other Agency personnel, which reflected favorably upon Plaintiff's work ethic, performance and skills as an attorney.

25.   Over a dozen clients submitted letters to Mr. Fleck's supervisor, Michael Hogan, on Plaintiff's behalf after Plaintiff was proposed for removal in September 2018.  The letters were provided to Mr. Fleck, the deciding official, prior to Plaintiff's removal.

26.   During her tenure with the Procurement Law Group (PLG), supervisors and attorneys consistently relied on Plaintiff's legal knowledge, skills and expertise, as well as Plaintiff's legal writing skills and written work product which was completed independently and generally without input or revisions by others.

27.   During her tenure with PLG, supervisors and attorneys consistently relied on Plaintiff's litigation skills which resulted in favorable outcomes in the cases Plaintiff had responsibility for, including bid protests filed with the Government Accountability Office (GAO).

28.   During her tenure with PLG, Plaintiff reviewed the work of junior attorneys, as requested by her supervisors, and voluntarily served as a mentor to many PLG attorneys and other attorneys within the VA.

29.   At the time of Plaintiff's removal, Plaintiff's first-line supervisor was Deputy Chief Counsel Candice Cornish and her second-line supervisor was Chief Counsel Robert Fleck.

30.   Mr. Fleck who previously worked for the Department of the Army in Aberdeen, Maryland, joined VA in May 2016.

31.  Ms. Cornish was promoted internally in November/December 2016 to GS-15 Deputy Chief Counsel.

32.  On November 29, 2016, Deputy General Counsel Michael Hogan sent an email internally to all VA OGC attorneys which announced "opportunities for non-supervisory GS-15 Trial Attorney positions focused on government procurement and real property litigation." The announcement stated the positions would be part of a larger OGC procurement litigation team and would require travel.

33.  Plaintiff did not submit an application, because Plaintiff was under a doctor's care at the time and was not able to travel.

34.  In January 2017, Plaintiff was requested by Ms. Cornish and Mr. Fleck to relinquish her office located at 810 Vermont Avenue, N.W., Washington, DC, in order to accommodate the new incoming e-Discovery Expert.

35.  Unbeknownst to Plaintiff, the incoming attorney was Mr. Fleck's wife who had previously worked with him at the Department of the Army before Mr. Fleck joined the VA in 2016.

36.  In early 2017, Mr. Fleck hired Michael Kraycinovich from the Department of the Army non-competitively to head the Procurement Law Group's newly formed litigation team.

37.  Mr. Kraycinovich who previously worked with Mr. Fleck at the Department of the Army, was hand-picked by Mr. Fleck for the position which placed him over the VA PLG attorneys.

38.  Although all PLG attorneys were litigators or were expected to be litigators,

Mr. Fleck and Ms. Cornish announced in 2017 that attorneys selected to be on the litigation team would have responsibility for all litigation and those attorneys not on the litigation team would be "transactional attorneys" responsible for supporting the litigation team attorneys.

39.  On September 22, 2017, then VA General Counsel James Byrne provided his  concurrence on a VA Hiring/Justification Form prepared by Attorney Michael Hogan, then Executive Director, Management, Planning and Analysis, which authorized the hiring of additional "Supply Funded Contracting Attorneys."

40.  The form stated, "Due to resource shortages in OGC there are inadequate existing staff in OGC's Procurement Law Group and District Contracting National Practice Group to handle workload.  The Supply Fund has authorized funding for FY18 for these positions… The current staff are being tasked to perform work beyond a reasonable capacity… These positions will be filled through recruitment of staff with contracting experience."

41.  PLG attorneys were informed by Ms. Cornish during a staff meeting in late October 2017 that authorization had been received to hire five to six additional attorneys for the PLG.

42. Contrary to the claims made by Mr. Hogan in the Justification Form submitted to the Agency General Counsel for approval, the PLG was not suffering from a resource shortage and attorneys were not being tasked to perform beyond a reasonable capacity.

43. After hearing that additional attorneys would be hired, Plaintiff who did not have a full workload, became concerned about whether there would be enough work for all PLG attorneys and questioned the need to hire additional attorneys.

44. From the time Plaintiff questioned Management's decision to hire more attorneys for the Procurement Law Group in late October 2017, she became a target for discrimination and was subjected to whistleblower retaliation.

**Medical Personnel Employment Question and Employee Counseling**

45. On October 30, 2017, Plaintiff was requested by Ms. Cornish via email sent at 1:44 p.m. to provide a brief memorandum stating the requirements VA would need to overcome in order to replace medical personnel with a contract?

46. In response, Plaintiff replied via email at 2 p.m., "This is not my area of specialty, even though I reviewed a question from the Health Care Law Group some time ago involving the use of a contractor."

47. At 2:59 p.m., Plaintiff forwarded Ms. Cornish's request to an agency attorney in another law group for assistance.

48. Plaintiff sent Ms. Cornish an email at 3:10 p.m. with a copy to Mr. Fleck which stated, "As Deputy Chief Counsel, you should be knowledgeable of this area which I have no familiarity with. Because your question is very broad and the answer may depend on any number of factors and circumstances, I request that you provide the background with more detailed information regarding your questions and the need to replace medical personnel with contractors. I have reached out to Eric Raun for assistance. If I receive a response from him, I will let you know."

49.  Without providing the background information requested by Plaintiff, Ms. Cornish requested via email sent on October 30, 2017 at 3:29 p.m. that Plaintiff provide a list of the matters currently under Plaintiff's review.

50.  Plaintiff responded via email at 4:30 p.m. on October 30, 2017 that she had only received three assignments since October 1, 2017.  Plaintiff's email stated, "As a supply fund attorney and the longest serving attorney for SAC-Frederick which has been my primary client, I should be receiving a fair share of that office's work, in addition to other assignments.  If there are not enough work assignments for the attorneys within PLG, I question whether there is a need to hire additional attorneys."

51.  Fourteen minutes after Plaintiff questioned the need to hire additional attorneys, Ms. Cornish sent Plaintiff an email at 4:44 p.m. accusing her of rejecting a work assignment.  The email stated, "I am concerned that this is the first instance in which you have identified a lack of work and that it is at the same time that you rejected a work assignment."

52.  At 9:01 a.m. on October 31, 2017, Plaintiff emailed her concerns regarding Management's plans to hire additional Procurement Law Group attorneys to VA Deputy General Counsel Richard Hipolit who was PLG Chief Counsel Robert Fleck's first-line supervisor.

53. Plaintiff's email stated, "... At last week's staff meeting, Candice mentioned that PLG had the green light to hire five to six additional attorneys.  This is of concern to me and to other PLG attorneys not currently receiving or maintaining a full workload... I ask that the status of PLG work assignments be reviewed to ensure the

work is being equitably distributed based upon attorney skills and experience. <u>I also</u> <u>request that a review be conducted of the need to hire additional attorneys, a</u>s well as the process for promotion of PLG attorneys."

54.   After a series of email exchanges with Ms. Cornish related to Ms. Cornish's October 30, 2017 request that Plaintiff provide a brief memo stating the requirements VA would need to overcome in order to replace medical personnel with a contract, Plaintiff requested on October 31, 2017 that Mr. Fleck intervene to state exactly what Ms. Cornish was asking Plaintiff to do.

55.   Plaintiff explained that she did not understand either of the two issues presented by Ms. Cornish and that she had not been provided with the background information she requested, so that she could understand the issues.

56.   Mr. Fleck did not respond to Plaintiff's email.

57.   On November 2, 2017, Ms. Cornish sent Plaintiff an email which purported to clarify the issue she wanted Plaintiff to research. She stated, "I am specifically requesting right now 4:02 p.m. 11/2/17, that you define 'Circular OMB 76' and provide a written definition to me by close of business tomorrow…"

58.  In response to Ms. Cornish's November 2, 2017 request, Plaintiff sent a three-page memorandum via email to Ms. Cornish, Mr. Fleck and Mr. Hipolit three minutes later at 4:05 p.m. which included a discussion of *"OMB Circular A-76."*

59.  A mid-year review given to Plaintiff by Ms. Cornish in June 2018 stated that Plaintiff refused to do the assignment and it was reassigned.

60.  A proposed removal issued to Plaintiff by Ms. Cornish in September 2018 stated for the first time that the memorandum Plaintiff completed 11 months earlier lacked analysis and was incomplete.

**Requirement to Send Daily Email and Notification of EEO Complaint**

61.  On October 30, 2017, Ms. Cornish sent the Procurement Law Group an email which stated, "I have received new requirements from the HR office and in order to comply I will need additional information.  Please assist by sending an email when you start your tour of duty for the next week."

62.  Plaintiff requested via email on October 30, 2017 that Ms. Cornish provide the Human Resources direction she referenced.

63.  Plaintiff also requested via email sent to Ms. Cornish on October 31, 2017 at 7:15 a.m. that Ms. Cornish let Plaintiff know how long emails notifying her when her workday had start would be required.

64.  At 3:35 p.m. on October 31, 2017, Plaintiff sent an email to Ms. Cornish requesting again that she provide the source of the daily email requirement and that Ms. Cornish state how long this requirement would be in effect.

65.  After a brief discussion of the inequitable distribution of work and Plaintiff's prior contributions/recognitions and receipt of an ICARE (Integrity, Commitment, Advocacy, Respect, Excellence) award from the office's primary client, Strategic Acquisition Center, Frederick (SAC-F) earlier in the year, Plaintiff's email stated, "At a time when VA attorneys and legal offices are asking for more resources, it is absolutely incomprehensible that any PLG attorney would not be receiving work assignments."

66. Ms. Cornish replied via email at 3:51 p.m. which stated, "This email is to ensure my instruction is clear. I specifically request that you send me an email each morning at the start of your tour of duty immediately beginning 11/1/17 until 12/29/17.

67. At 4:48 p.m., Plaintiff responded with an email that stated, "Your email below requesting that I send you an email each morning at the start of my tour of duty beginning November 1, 2017 and ending December 29, 2017 is inconsistent with the attached email you sent to the group yesterday requesting an email for the next week… Unless you can show that your requirement… is mandated by OGC HR… I will file an EEO complaint against you and the agency for discrimination."

68. A 4:52 p.m. email from Ms. Cornish to Plaintiff stated, "I specifically request that you (Jo Spence) send me an email each morning at the start of your tour immediately beginning 11/1/17 until 12/29/17."

69. At 5:06 p.m., Plaintiff informed Ms. Cornish, Mr. Fleck and Mr. Hipolit via email that she would comply with the instruction and would also file an EEO complaint.

70. Plaintiff filed an EEO complaint against Ms. Cornish and Mr. Fleck on November 6, 2017 which alleged discrimination and disparate treatment based on Plaintiff's race, sex and age, in connection with the requirement imposed on Plaintiff to send Ms. Cornish an email each morning from November 1, 2017 to December 29, 2017 stating when Plaintiff's workday started.

71. On November 13, 2017, Plaintiff sent an email to Mr. Fleck with a copy to Mr. Hipolit requesting the justification for the continued requirement that Plaintiff provide daily emails to Ms. Cornish through December 29, 2017.

72. Plaintiff sent an email to Mr. Hipolit with copies to Ms. Cornish and Mr. Fleck on November 13, 2017 requesting that the Office of General Counsel intervene and provide the justification or put an end to the requirement imposed on Plaintiff.

73. No justification was provided to Plaintiff and Plaintiff was required to continue sending daily emails to Ms. Cornish after other attorneys had stopped sending emails stating when their workday started.

**Change in Work Duties and Responsibilities**

74. At 3:04 p.m. on November 14, 2017, Ms. Cornish sent Plaintiff an email which stated, "I am requesting you enter notice of appearance and represent VA in the attached protests for which you have thus far acted as transactional attorney.

75. Via email sent at 3:51 p.m., Plaintiff replied, "Please explain why the VECTOR protests are not being handled by the Litigation Team... I should be able to handle the Pathfinder protest... The other protest which is due December 13, 2017 will have to be handled by another attorney, as I will be on leave for most of the month of December."

76. On November 15, 2017, Ms. Cornish sent Plaintiff an email just after 8:00 a.m. which stated, "Please give me a status on the protest matters you have been assigned. I would like you to cc me when you enter your notice of appearance today."

77. Plaintiff informed Ms. Cornish via email on November 15, 2017 that she considered Ms. Cornish's request for the status of the two protests assigned to Plaintiff at 3 p.m. the day before to be harassment.

78. Ms. Cornish replied via email on November 15, 2017, "Given your specific knowledge and current workload of individuals reporting to me who are also on the litigation team, I am requesting that you handle these protests. I would like you to cc me when you enter your notice of appearance today."

79. An email sent 20 minutes earlier by the Agency employee responsible for protest intake and processing to Michael Kraycinovich (head of the litigation team) and Steven Devine (member of the litigation team) with a copy to Ms. Cornish, stated, "Since you represented VA in the previous cases...."

80. Plaintiff responded via email on November 15, 2017 sent at 3:02 p.m. which stated, "... I view your sudden change in my role and your demands that I handle two protests which would normally be handled by the Litigation Team attorneys including a protest I stated I would not be able to handle because I would be on leave and a protest that was with the Litigation Team eight days before it was given to me, as part of a continuing pattern of discrimination and retaliation for my complaints including my complaint to the Office of Resolution Management. Due to the undue and unnecessary stress caused by your actions, I will be taking sick leave the rest of today. I will enter my leave in VATAS."

81. In reply, Ms. Cornish stated via email sent to Plaintiff at 3:19 pm., "... I will accept your below email as your final decision that you refuse to follow direct instruction to enter notice of appearance and perform legal duties of representation."

82.  Plaintiff was unable to take sick leave and sent an email to Ms. Cornish at 4:45 p.m. stating, "Notices of appearance have been entered for B-414599.4 and .5. Please stop harassing me."

83.  At 6:48 p.m., Plaintiff sent Ms. Cornish an email that stated, "Your harassment of me has now escalated to daily harassment with unreasonable demands and changed rules to fit your personal agenda.... SharePoint shows that no PLG attorney other than a Litigation Team attorney has handled any litigation matters since the team was formed.  For this reason, I believe your actions in assigning me two protests after I expressed that I no longer wished to handle litigation to be retaliatory. To extract from my email stating I was going to be on sick leave this afternoon that I was refusing to follow your instruction to enter my appearance at GAO and represent the agency in litigation is outrageous.  Even more outrageous is that you would continue harassing me after I stated I was going to be on sick leave for the rest of the day."

84.  At 10:33 p.m. on November 30, 2017, Plaintiff presented concerns she had regarding the Pathfinder GAO protest assigned to her on November 14, 2017 to Clint Druk, Deputy Director for the Strategic Acquisition Center, Frederick (SAC-Frederick) via email.

85.  In that email, Plaintiff stated, "It is a rare occasion that I am at odds with my clients, but this is one of those occasions where I lack the confidence to proceed to GAO… Given that Terrie and Josh will be unavailable next week when the agency response is due, I request that you review all of my comments and let me know if

SAC-Frederick wishes to move forward with the CO's [Contracting Officer's] Statement of Facts. Friday is my CWS day, but I will try to check my emails when I can. The agency report is due to GAO on Wednesday, December 6. I will be on leave after December 5. So, the report with all exhibits must be prepared by SAC-Frederick so that it is ready to go to GAO no later than Tuesday, if SAC-Frederick wants to proceed to GAO.

**Written Counseling**

86.  On November 16, 2017, Ms. Cornish issued Plaintiff a Written Counseling for Conduct Unbecoming a Federal Employee via email at 11:46 a.m.

87.  The counseling letter stated, "On Monday, October 30, 2017, you sent me an email and CC'c [d] my immediate supervisor Mr. Robert Fleck. In the body of the email you stated: 'As the Deputy Chief Counsel, you should be knowledgeable of this area which I have no familiarity with.' This email did not reflect the VA ICARE Core Values and Characteristics."

88.  Plaintiff's email reply sent to Ms. Cornish on November 16, 2017 stated, "... Your use of your position as a supervisor to levy unwarranted charges against me, i.e., conduct unbecoming of a federal employee, and your threats of future progressive discipline if I fail to follow VA's ICARE values is an absolute abuse of your power and authority as a supervisor... I have filed a new EEO complaint against you. "

89.  Upon information and belief, Plaintiff was issued the November 16, 2017 written counseling in retaliation for the EEO complaint Plaintiff filed 10 days earlier against her supervisors and as reprisal for the information disclosed by Plaintiff to her

16

supervisors on October 30, 2017 which called into question the need to hire additional PLG attorneys.

**Admonishment and Counseling Letters**

90.   Thirty-four minutes after being issued the written counseling, Ms. Cornish sent Plaintiff an email claiming Plaintiff was absent from a "required" staff meeting on November 14, 2017.

91.   Plaintiff was requested to provide Ms. Cornish with an explanation "as to why you were not in attendance for this meeting by Close of Business November 17, 2017."

92.   Plaintiff responded immediately and stated she was in attendance at the [telephonic] meeting and requested that Ms. Cornish stop harassing her.

93.   Ms. Cornish replied that she had a roll call and Plaintiff did not respond and was not on the call.

94.   Plaintiff provided Ms. Cornish with an email on November 16, 2017 which provided all of the details of the meeting.

95.   Plaintiff's email also stated she had a witness to her attendance.

**Client Complaint**

96.   At 10:33 p.m. on November 30, 2017, Plaintiff presented concerns she had regarding the Pathfinder GAO protest assigned to her on November 14, 2017 to Clint Druk, Deputy Director for the Strategic Acquisition Center, Frederick (SAC-Frederick) via email.

97.  In that email, Plaintiff stated, "It is a rare occasion that I am at odds with my clients, but this is one of those occasions where I lack the confidence to proceed to GAO… Given that Terrie and Josh will be unavailable next week when the agency response is due, I request that you review all of my comments and let me know if SAC-Frederick wishes to move forward with the CO's [Contracting Officer's] Statement of Facts.  Friday is my CWS day, but I will try to check my emails when I can.  The agency report is due to GAO on Wednesday, December 6.  I will be on leave after December 5.  So, the report with all exhibits must be prepared by SAC-Frederick so that it is ready to go to GAO no later than Tuesday, if SAC-Frederick wants to proceed to GAO."

98.  In response to Plaintiff's email, Mr. Druk replied on December 1, 2017 that he was unclear about what Plaintiff meant by "report with all exhibits must be prepared by SAC-Frederick."

99.  Plaintiff explained to Mr. Druk via email that "for any protest, there must be a protest file for GAO to review which contains all of the acquisition documents related to the protest.  This is the fourth VECTOR GAO protest.  So, there is probably a file already put together…"

100.  Mr. Druk asked Plaintiff if he could get a list of the documents she needed.

101.  Plaintiff replied to Mr. Druk via email sent at 11:28 a.m. on December 1,2017 which stated, "Steven Devine of the PLG Litigation Team worked on the three prior protests I believe.  Possibly, he can provide you with a list of the documents. Basically, it will be all documents related to the procurement, including the solicitation,

amendments, Pathfinder's protest and a redacted BCM [Business Clearance Memorandum]... I am on leave today and will not be accessible after 11:30 a.m..."

102.  Upon information and belief, Mr. Druk was overwhelmed by having to perform the unfamiliar duties of his absent contracting officer and contract specialist who would normally be responsible for gathering the documents needed for the report to GAO.

103.  Mr. Druk vented his frustrations to Ms. Cornish in an email at 11:45 a.m. directed at Plaintiff who was off work which stated, "Jo's handling of this strikes me as odd and much different than any protest situation I've been involved with at any agency.  She strikes me as having a posture of disengagement at this point and essentially saying, 'Don't agree with me?  Good luck, take care of it yourself.  I'm OOO...'  I'm happy to ask Stevin but don't think he'd appreciate being blindsided and not very well positioned to respond not knowing the specifics."

104.  Mr. Druk's stated opinions about Plaintiff were characterized as a client complaint by Plaintiff's supervisors who used his statements to support Plaintiff's removal.

105.  After the Agency Report for the Pathfinder GAO bid protest, B-414599.4, was submitted by Plaintiff to GAO on December 5, 2017, two days before it was due, Mr, Druk sent Plaintiff an email which stated, "Thank you.  I was really worried for a bit but everyone really stepped up and rocked this thing..."

**Failure to Approve Plaintiff's Use or Lose Leave Request**

106.  With knowledge that Plaintiff was scheduled to be on leave beginning December 6, 2017, Ms. Cornish assigned Plaintiff a third GAO bid protest on December 1, 2017.

107.  The protester was ARTi.

108.  On December 4, 2017, Plaintiff notified Ms. Cornish via email that the protest filed by ARTi which had been assigned to Plaintiff, required reassignment to another attorney because Plaintiff would be on leave.

109.  The ARTi protest was reassigned to another attorney without issue.

110.  Upon information and belief, the simultaneous assignment of multiple protests to Plaintiff which had been previously been handled by litigation team attorneys was deliberate and intended to increase work pressure on Plaintiff in retaliation for her EEO and whistleblower activity.

111.  Regarding Plaintiff's request for approval of use or lose leave scheduled to begin on December 6, 2017, Ms. Cornish requested via email on December 4, 2017 that Plaintiff let her know if work on the Pathfinder GAO protest would be completed on time before she decided whether to approve Plaintiff's leave request [which had been in pending status in the VA Time and Attendance System since November 21, 2017].

112.  Plaintiff provided an immediate "affirmative" response to Ms. Cornish, indicating that work on the protest would be completed on time.

113.  Despite Plaintiff's immediate response to Ms. Cornish on December 4, 2017, Plaintiff's request for leave was not approved on December 4, 2017.

114.   By close of business on December 5, 2017, Ms. Cornish had failed to approve Plaintiff's leave request for 123 hours of use or lose annual leave.

115.   Concerned that she would be charged with being absent without leave (AWOL) if she proceeded with her plans to start leave on December 6, 2017, Plaintiff reported for duty at her regular time on the morning of December 6.

116.   At 10:20 a.m. on December 6, 2017, Plaintiff sent an email to Mr. Fleck with a copy to Mr. Hipolit stating that she viewed Ms. Cornish's outright and deliberate failure to approve her leave as further harassment and retaliation.

117.   Plaintiff requested that Mr. Fleck have someone other than Ms. Cornish approve Plaintiff's leave without further delay.

118.   Plaintiff entered a new leave request in the VA Time and Attendance System (VATAS) on December 6, 2017 for 134 hours with a start date of December 11, 2017.

119.   Plaintiff's revised leave request was not approved by Ms. Cornish until Friday, December 8, 2017.

120.   Upon information and belief, Ms. Cornish's failure to timely approve Plaintiff's initial leave request which had been in VATAS since November 21, 2017 was in retaliation for Plaintiff's EEO and whistleblower activity

121.   Upon information and belief, Ms. Cornish was planning to charge Plaintiff with AWOL in the event Plaintiff was absent from work on December 6, 2017 without Ms. Cornish's prior approval of her leave.

122.  Plaintiff filed an EEO complaint in response Ms. Cornish's failure to approve her use or lose leave in time for Plaintiff to take leave beginning on December 6, 2017.

**Interference with Plaintiff's Ability to Perform**

123.  At 11:45 a.m. on December 4, 2017, Ms. Cornish issued Plaintiff an admonishment letter which claimed Plaintiff was not on the November 14, 2017 staff meeting call.

124.  Ms. Cornish intentionally did not reference or include Plaintiff's previously submitted email which contained the details of the meeting.

125.  Ms. Cornish was aware on December 4, 2017 that when she issued Plaintiff a letter of admonishment and claimed she was not on the staff meeting call that Plaintiff was under pressure to complete work on the GAO bid protests assigned to Plaintiff before Plaintiff started leave on December 6, 2017.

126.  The Agency report for the Pathfinder protest which was given to Plaintiff by Ms. Cornish eight days after it was received by the litigation team was due to GAO by December 7, 2017.

127.  Upon information and belief, Ms. Cornish's actions were intended to interfere with Plaintiff's ability to complete work on the protests and the admonishment letter and harassment over Plaintiff's alleged absence from the staff meeting were in retaliation for Plaintiff's EEO and whistleblower activity which included disclosures of information made by Plaintiff to her superiors, the OIG and the OSC regarding the

improper hiring of attorneys from the Department of the Army who were not performing as GS-15 trial attorneys, as required by the job announcement they were hired under.

128.  On December 7, 2017, Plaintiff provided Ms. Cornish with a copy of the [Pathfinder] Contracting Officer's Statement submitted to GAO and notified GAO via email that she would be on leave starting the next week.

129.  With knowledge that Plaintiff completed work on the GAO protests prior to December 7, 2017, Ms Cornish stated in a mid-year review given to Plaintiff in June 2018, "On 12/7/2017 at 11:11am you directly contacted Charmaine A. Stevenson, a Senior Attorney with the GAO, and informed her you would not be handling protests which you had entered notice of appearance.  This was taken without consulting me as a supervisor.  You had been instructed in previous instructions to act on behalf of the agency in these matters.  You were either incapable of handling the protests or incapable of understanding the instructions or both."

**Negative Performance Evaluation**

130.  On December 21, 2017, Ms. Cornish issued Plaintiff a performance appraisal with a "Fully Successful" rating for the 2016-2017 performance rating period without explanation or justification for the lowered rating.

131.  The rating was two levels lower than the "Outstanding" rating Plaintiff received for the 2015-2016 performance rating period.

132.  Plaintiff provided written objections to the rating to Ms. Cornish.

133.  Of the 33 attorneys in the Procurement Law Group, Plaintiff received the lowest performance rating and the only "Fully Successful" rating in 2017.

134.  Twenty-nine attorneys received "Outstanding" ratings and three attorneys, including two at the GS-13 grade level,  received "Excellent" ratings

135.  Upon information and belief, Plaintiff's "Fully Successful" rating and her supervisors' refusal to consider Plaintiff's updated performance assessment prior to issuance of the rating were in retaliation for Plaintiff's EEO and whistleblower activity.

136.  Even without Plaintiff's assessment, Plaintiff's supervisors were aware of the high volume of assignments handled by Plaintiff during the performance rating period.

137.  The "Fully Successful" rating given to Plaintiff was also discriminatory and based on Plaintiff's age, race, and sex.

138.  Plaintiff and another Black female PLG attorney over the age of 40 were the only GS-14 attorneys in the Procurement Law Group to receive a rating of less than "Outstanding" for the 2016-2017 performance year.

139.  All Caucasian GS-14 attorneys, all male GS-14 attorneys and all GS-14 attorneys under the age of 40 received "Outstanding" performance ratings for the same performance period.

140.  The rating official, Ms. Cornish, is a Black female under the age of 40.

141.  Plaintiff filed an EEO complaint in response to being given a "Fully Successful" performance rating.

**State Approving Agency Agreements**

142.  On January 19, 2018, Ms. Cornish sent Plaintiff and Attorney Bryan Thompson of the VA Benefits Law Group an email regarding State Approving Agency (SAA) contracts.

143.  Ms. Cornish stated that she had met with Robert Worley of the Veterans Benefits Administration (VBA) and had been informed that the Office of General Counsel (OGC) had opined in the past on the SAA agreements and requested clarification on the advice provided to the program.

144.  In response to Ms. Cornish's email, Mr. Thompson replied via email that the Benefits Law Group did not address whether the contract was properly administered by any part of VA.

145.  He further stated, "I sent you our proposed draft of that advice, an options paper for EDU [VA's Education Service] on January 4th, when we requested your assessment."

146.  On January 19, 2018, Ms. Cornish sent an email to PLG Attorney Vanessa Calabrese regarding SAA agreements which included an old email sent to Plaintiff by a VBA employee in 2016 requesting that Plaintiff take a look at the administration of SAA agreements.

147.  Ms. Cornish found the email to Plaintiff in the office's GCLaws database.

148.  On January 22, 2018, Ms. Cornish sent an email to Mr. Thompson and to Plaintiff which asked, "Can you discuss/provide statement, regarding how matters are handled when benefit a the requirements to obtain a benefit are not met?"

149.  Mr. Thompson replied, "I'm not sure I understand your question for me, or why that information is useful.  I think your inquiry is about the process for denial or grant of benefits… I apologize but I'm afraid I need clarification in order to get you something useful."

150.  A January 22, 2018 email sent by Ms. Calabrese to Ms. Cornish showed that Ms. Calabrese had been tasked with addressing SAA issues that originated with a draft benefits law paper which discussed the litigation risks associated with various actions under the contract with the Arizona SAA's approval of Ashford University.

151.  Ms. Calabrese sent Plaintiff an instant message on January 22, 2018 asking if Plaintiff had any insight or information on SAA agreements.

152.  Plaintiff informed Ms. Calabrese on January 22, 2018 that she did not have much information to share and provided Ms. Calabrese with a brief history of the SAAs.

153.  On January 23, 2018, Ms. Calabrese sent Plaintiff an email asking if Plaintiff recalled the last time she reviewed SAAs.

154.  She asked if it was possible to send her a couple of the most recent reviews.

155.  Plaintiff immediately replied via email and stated the reviews were done annually, but that Plaintiff could not remember the last time she had reviewed SAA agreements.

156.  Plaintiff explained that her system crashed and she did not have any documents related to SAA agreements that she could send to Ms. Calabrese.

157.  Plaintiff informed Ms. Calabrese that if she located anything, she would let Ms. Calabrese know.

158.  Believing that the SAA issues raised in 2016 had resurfaced in 2018, Plaintiff sent an email on February 28, 2018 to the author of the 2016 SAA email who informed Plaintiff that she was no longer working with the SAA agreements.

159.  Plaintiff's email and Ms. Dark's response were forwarded to Ms. Calabrese and Ms. Cornish.

160.  An email prepared by Ms. Calabrese and sent to Ms. Cornish on January 29, 2018 revealed that Ms. Calabrese was researching issues related to the Federal Acquisition Regulation and the delegation provisions that authorized the program office to negotiate and enter into agreements.

161. Plaintiff had no prior involvement with the SAA matters and issues Ms. Calabrese was tasked with researching in January 2018.

162.  In February 2018, Plaintiff was requested to provide assistance to Ms. Cornish and to Ms. Calabrese who was preparing a written response to the client, Mr. Worley.

163.  After Plaintiff reviewed Ms. Calabrese's draft response, Ms. Cornish stated, "Let's close this for GC law and consider the client counseled until there is a new request."

164.  At least two client requests for review of actions involving issues believed to be related to SAA agreements were escalated to Ms. Cornish's attention in 2017.

165.  Plaintiff received an email from Ms. Dark on January 13, 2017 requesting assistance with SAA issues.  Plaintiff was out of the office and recommended that Ms. Dark send any new requests for review of SAA issues to Ms. Cornish.

166.  Ms. Dark replied via email, at 12:19 p.m., "Thanks so much for the quick response."

167.  On August 31, 2017, Bryan Thompson sent Plaintiff an email stating that his group was dealing with issues that had a contracting component.

168.   Attached to Mr. Thompson's email was an options paper.

169.  Because Plaintiff was going to be out of the office for 10 days after that date, Plaintiff  forwarded Mr. Thompson's request to Ms. Cornish at 11:53 a.m. on August 31, 2017 for attorney assignment.

170.  When Plaintiff returned from leave, Plaintiff learned the action had not been reviewed and Plaintiff completed the review for Mr. Thompson on September 15, 2017.

171.  The mid-year review given by Ms. Cornish to Plaintiff in June 2018 stated, "In January I learned of your failure to provide review and be responsive to client offices and your fellow line attorney, Vanessa Calabrese, in the matter of 'State Approving Agency Agreements.'  You worked on a matter advising on how to handle the VA's program for reimbursement of State Approving Agencies who certify the Education providers who determine what programs Veterans can attend.  GC Laws show you have had this assignment since 2013, however, when Ms. Calabrese attempted to contact you, you claimed not to have knowledge and did not provide any

of the information you possessed.  Ms. Calabrese had to take over the matter and perform thorough research in order to support the client.  Your support fails to meet the requirement of a GS14 for stakeholder service."

172.  The proposed removal issued to Plaintiff by Ms. Cornish stated the matter was reassigned and performed by a replacement attorney.

173.  Ms. Calabrese did not take over any SAA matters in January 2018 that had previously been assigned to Plaintiff.

174.  The SAA matter at issue which originated with Mr. Worley and Mr. Thompson, was given by Ms. Cornish directly to Ms. Calabrese in January 2018 for review and response.

**Denial of Plaintiff's Transfer Requests**

175.  Plaintiff submitted a request to transfer via email to Mr. Hipolit on February 26, 2018 which stated, "PrLG has so many attorneys that there is not enough work for all of us to be gainfully employed.  Most days, I have few, if any, work assignments. Under the circumstances, I should be allowed to transfer to an office where I can use my skills and experience.  In addition, nothing positive can come from the forced continuation of my employment within PrLG, as the damage to my working relationship with Candice and Bob is irreparable…"

176.  Between November 2017 and April 2018, Plaintiff submitted numerous requests for transfer to Mr. Hipolit.

177.  All of Plaintiff's requests to Mr. Hipolit to be transferred were denied, even though Mr. Hipolit possessed the authority to transfer and reassign Plaintiff.

178.  Mr. Hipolit told Plaintiff she could not be transferred because PLG lacked resources and the PLG could benefit from her experience and expertise.

179.  Upon information and belief, Mr. Hipolit who along with Mr. Hogan, gave Ms. Cornish his support to remove Plaintiff in early April 2018, deliberately left Plaintiff in place until she could be terminated.

180.  Upon information and belief,  Mr. Hipolit and Mr. Hogan who were interviewed by OIG investigators in early 2018 in connection with the unlawful hiring of Mr. Fleck's wife, were concerned they would be exposed by Plaintiff's whistleblower activity which included complaints that the attorneys selected by Mr. Fleck to fill the GS-15 trial attorney vacancies for the PLG were not needed, were improperly hired, and were performing the work of GS-14 contracts attorneys instead of GS-15 trial attorneys.

**Denial of Request to Change Telework Schedule**

181.  On March 5, 2018, Ms. Cornish denied Plaintiff's request to change her telework schedule from 7:15 a.m. to 4:45 p.m to 6:30 a.m. to 4:00 p.m.

182.  Ms. Cornish stated Plaintiff had provided no specific basis for the request, she needed to consider workload in making such determination and attorneys were needed during late hours.

183.  In response to Ms. Cornish's denial of Plaintiff's request to change her tour of duty hours, Plaintiff stated in an email to Ms. Cornish on March 5, 2018, "As far as workload is concerned, I have barely had any work to speak of since early January 2018 and any work assigned to me has been completed well ahead of scheduled due

dates and time.  In fact, I have complained repeatedly that there are too many PrLG

attorneys and not enough work for all.  If there is a need for attorneys to work later

hours, this is the first I have heard of such need in the 11 years I have been at the VA…

Contrary to your claim that attorneys are needed during late hours, most of the clients I

work with work very early shifts and are off the clock by 4:00 p.m…"

184.  Upon information and belief, Ms. Cornish's denial of Plaintiff's request to

change her tour of duty hours was discriminatory and in retaliation for Plaintiff's EEO

and whistleblower activity.

185.  Sarah McWilliams, a Caucasian female attorney over the age of 40 who

worked for the same clients as Plaintiff, was working the same hours Plaintiff

requested that Ms. Cornish approve for Plaintiff at the time Ms. Cornish denied

Plaintiff's request.

186.  Sarah was hired from the Department of the Army two months earlier.

187.  In an email to Ms. Cornish on March 7, 2018 with a copy to Mr. Hipolit and

Mr. Hogan, Plaintiff stated, "… There is not currently enough work for all PrLG attorneys

to have a full workload."

188.  Plaintiff filed an EEO complaint against Ms. Cornish for failure to approve

Plaintiff's request to change her telework schedule.

**Changes to Telework Agreement**

189.  On March 7, 2018, Ms. Cornish issued new Telework Agreement terms

and conditions which required that Plaintiff and other teleworkers respond to phone

calls, Microsoft Lync, Skype messages, and emails within one hour and that if for any

reason the teleworker was unable to meet these times, the teleworker was required to notify the supervisor and provide an explanation as to why the times were not met.

190. A second term stated, "Employees understand that Telework may be suspended by management in order for the employee to attend training and/or mandatory meetings…"

191. A third term required that teleworkers install and use a web camera.

192. A fourth term stated, "The employee understands that working overtime without permission may result in termination of the telework Agreement. The employee also understands that if instructed by the supervisor to work overtime (e.g. time in excess of the prescheduled and authorized tour of duty), the employee will need to follow that instruction when ordered by the direct Supervisor."

193. Out of concern that the new telework terms and conditions would subject her to further acts of discrimination and retaliation by her supervisors, Plaintiff sent an email to Mr. Hipolit, VA Deputy General Counsel, on March 7, 2018 which stated that she took exception to some of the terms and conditions of the Agreement and that she was concerned that the new terms and conditions would subject teleworkers to harassment by the supervisor.

194. Mr. Hipolit did not respond to Plaintiff's email.

195. Because Plaintiff had previously objected to the installation and use of a web cam in her home, Plaintiff filed an EEO complaint alleging that she was specifically targeted by the new term and condition that made installation of a web cam a requirement for teleworking.

**VA Medical Sharing Office Assignments**

196.  On March 12, 2018, Plaintiff received an assignment to review 16 Basic

Healthcare Resources Training Modules (40 CLP).  The request for legal review was

submitted to the Procurement Law Group's SharePoint site by Sharon Hallmark of the

VA Medical Sharing Office (MSO).

197. Within one hour of receipt of the action, Plaintiff notified Ms. Hallmark that

she had received the action for review and requested that Ms. Hallmark highlight the

procurement language she was requesting that Plaintiff review.

198.  In a subsequent email to Ms. Hallmark on March 12, 2018, Plaintiff stated,

"I am concerned that you are submitting an excessively large number of documents to

the office for legal review which would not normally be reviewed by this office… If you

have specific language that requires legal review, please highlight and provide.

Otherwise, I request that you refrain from submitting documents through SharePoint

which are or may not be appropriate for legal review."

199.  Ms. Hallmark replied via email which stated, "Since these are already in

the portal - I can email you and identify the module and slide numbers."

200.  Ms. Hallmark stated in a separate email to Plaintiff, "I have never used the

portal… I would like to understand more clearly directions as to what should be

included in this portal…"

201.  Plaintiff informed Ms. Hallmark via email on March 12, 2018 that "the

SharePoint site is available for ALL actions that require legal review… If you require

assistance in determining whether an action is appropriate for OGC review, please

contact Bob Fleck, Candice Cornish or another member of the Procurement Law
Group."

202.  On March 14, 2018, Plaintiff informed Ms. Hallmark that she had reviewed
the CBOC virtual training slides and found they did not provide material appropriate
for OGC review.

203.  Plaintiff recommended that Ms. Hallmark review the slides and submit
specific language, legal issues or questions she wanted Plaintiff to review.

204.  Plaintiff sent Ms. Cornish an email on March 14, 2018 which stated, "A
review of SharePoint shows 96 actions pending for PrLG [Procurement Law Group].
Of these 96 actions, more than one-third (35) come from Sharon [Sandra] Hallmark of
the Medical Sharing Office (MSO)... Sharon [Sandra] Hallmark claims she did not
understand what was and was not appropriate for legal review.  Based on this, I
recommend that all pending SharePoint requests from MSO be reviewed further to
determine if they are, in fact, appropriate for PrLG's legal review.  I currently have no
MSO actions pending review."

205.  Plaintiff received no response from Ms. Cornish.

206.  After being contacted by Ms. Hallmark for assistance in determining which
actions were appropriate for legal review, as recommended by Plaintiff, Ms. Cornish
sent Plaintiff an email on March 16, 2017 which stated, "Per your 2018 performance
standards 'Stakeholder Service' it is required that you work with client offices to
proactively identify issues, risks or trends and provide sound legal advice.  At this time
your response fails to provide such advice and has required that I, as your supervisor,

intervene with stakeholders."  Ms. Cornish further stated, "Please review all documents provided by the Medical Sharing Office in connection with GCL 125180 and 125047 response to client which identifies salient characteristics or clarify that no issues have been identified."

207.  Plaintiff, who had 10 days from receipt of the MSO documents to complete her reviews, reviewed all MSO documents on the dates the actions were received and completed further reviews of all documents within the allotted 10-day review period.

208.  In an email sent to Ms. Cornish on March 16, 2017, Plaintiff stated that GCLaws 125180 consisted of 427 slides and GCLaws 125047 had 75 slides for a total of 502 slides submitted for review.

209.  Plaintiff informed Ms. Cornish that it was reasonable for Plaintiff to request that the client narrow the scope of review and that once the client did so, further review of the actions would be conducted in accordance with established PrLG review timelines.

210.  An email sent by Plaintiff to Ms. Hallmark on March 19, 2017 regarding review of the CBOC Virtual Training Slides stated, "There are 75 slides for the subject action.  Many of the slides contain material that is not appropriate for review by the Procurement Law Group… I recommend that you review the slides and submit the specific language, legal issues or questions you would like reviewed…"

211.  This was a second request to the Ms. Hallmark.

212.  A second email sent by Plaintiff to Ms. Hallmark on March 19, 2017 regarding review of the Basic Healthcare Training Modules stated, "The subject action

consists of more than 400 slides.  Many of them contain material which is not appropriate for review by the Procurement Law Group.  As requested in the email below, please highlight the procurement language you are requesting this office to review…"

213.  This was also a second request to Ms. Hallmark.

214.  Plaintiff provided further review of the CBOC Virtual Training Slides and the Basic Healthcare Training Modules on March 20, 2017 and provided responses to Ms. Hallmark for each action.

215.  Ms. Hallmark responded with emails to Plaintiff on March 20, 2017 which thanked Plaintiff for looking at the slides.

216.  Ms. Hallmark stated for the CBOC virtual training slides, "When the slides are updated in the future - we will introduce them into the OGC portal differently based on comments."

217.  For the Basic Healthcare Resources Training Module slides, Ms. Hallmark stated, "For future reviews when edits are made, I will enter the request differently based on the direction you provided…"

218.  Between February and March 2018, Plaintiff reviewed a number of MSO actions submitted by Ms. Hallmark to the PLG for review.

219.  On February 20, 2018, Plaintiff received and reviewed "Certification Sample - Conflict of Interest."

220.  On March 5, 2018, Plaintiff received and reviewed "Sample Negotiation Kickoff Instructions."

221.  On March 5, 2018, Plaintiff received and reviewed "Sample Language for EPA Educational Costs Contract."

222.  On March 12, 2018, Plaintiff received and reviewed "Sample Award Approval Documentation."

223.  On March 12, 2018, Plaintiff received and reviewed "Sample Instructions to offerors for educational costs contract requests."

224.  On March 14, 2018, Plaintiff received and reviewed "Sample Interim Request Memo."

225.  On March 14, 2018, Plaintiff received and reviewed "Legal Review of Performance Work Statements."

226.  None of Plaintiff's prior reviews of MSO actions required the input or intervention of Ms. Cornish who claimed in the proposed removal issued to Plaintiff that Plaintiff failed to take needed actions, requiring supervisory intervention, Plaintiff refused to review MSO's documents and Plaintiff failed to consider formality and tone in communications with Ms. Hallmark.

227.  Ms. Hallmark individually submitted 70 actions via SharePoint for review by the PLG attorneys which was more than the total number of actions submitted by any client office.

228.  Upon information and belief, Ms. Hallmark was invited or encouraged to submit a large number of documents that would not normally require review by PLG attorneys to SharePoint, in order to provide work for the increased number of PLG

attorneys who were sharing assignments that generally required the review of one attorney.

**Performance Counseling Letter**

229. On April 4, 2018, Plaintiff was issued a Performance Counseling letter by Ms. Cornish which informed Plaintiff that she needed to improve her performance in three critical elements (Professional Responsibility & Accountability, Stakeholder Service, Quality of Legal Products) and one non-critical element (Timeliness).

230. The letter which merely re-stated the criteria for an unacceptable performance rating taken from the GS-14 Attorney Performance Standards stated that Plaintiff failed to render sound legal advice, did not respond to stakeholders in a clear/concise manner such that the stakeholders could understand what actions to take, Plaintiff's communications with stakeholders were unprofessional and failed to maintain a positive relationship with stakeholders, Plaintiff did not conduct proper reviews or manage GAO protests in an appropriate and professional manner, and Plaintiff's email communications were unintelligible, etc.

231. Ms. Cornish's unwarranted attack on Plaintiff's work ethic, work performance and intelligence did not include examples of unacceptable work performance.

232. The letter stated, "In the event that you do not achieve and maintain a fully successful level of performance for the duration of the fiscal year, a performance based action may be imposed, resulting in your reassignment, demotion, or removal from Federal service."

233.  In an email sent by Plaintiff to Mr. Hipolit with a copy to VA General Counsel Jim Byrne, Mr. Hogan and Sharon Weiner of OGC, Plaintiff stated, "The attached counseling letter issued to me by Candice is yet another example of her pattern of continued harassment and retaliation… So that I can continue serving the veterans and my clients, I am requesting that you address my concerns without further delay and that Candice be required to rescind today's performance counseling letter and cease all acts of discrimination against me including harassment and retaliation.

234.  Ms. Cornish was not required to rescind the April 4, 2018 performance counseling letter and the harassment and retaliation against Plaintiff continued.

235.  Plaintiff submitted an informal grievance to Ms. Cornish which stated, "I take exception to the entire letter which does not contain a scintilla of truth and does nothing but repeat the criteria provided for an unsuccessful rating in the critical elements identified.  Because you have not provided any support whatsoever for anything stated in your letter, I cannot respond to your accusations except to deny each and every one and state that they are false and constitute actionable libel."

236.  Ms. Cornish denied Plaintiff's request for relief, stating she found that Plaintiff's claims had no merit.

237.  A formal grievance submitted by Plaintiff was rejected by Mr. Fleck who stated it was excluded from the grievance procedure.

238.  Upon information and belief, the April 4, 2018 counseling letter issued to Plaintiff was in retaliation for Plaintiff's EEO activity and whistleblower activity.

239.  Upon information and belief, the April 4, 2019 counseling letter was prepared and issued to Plaintiff for the sole purpose of initiating the process for Plaintiff's removal based on unacceptable performance.

240.  Upon information and belief, examples of Plaintiff's alleged unacceptable performance were sought and generated by Ms. Cornish with the help of Human Resources personnel and Agency counsel Danielle Kalivoda after Plaintiff was given the April 4, 2019 letter claiming her performance was unacceptable.

**VECTOR Business Clearance Memorandum and Claims Plaintiff Refused to Perform**

241.  On April 9, 2018, the SAC-F Director, Efrain Fernandez, requested clarification from Ms. Cornish regarding whether Plaintiff or Michael Kraycinovich, the head of the PLG litigation team, was the attorney of record for the revisions to the VECTOR Business Clearance Memorandum (BCM) for the SRE GAO bid protests .9 and .10.

242.  The BCM supported the evaluations of offers from vendors and the contracting officer's contract award decisions for the $25 billion VECTOR requirement and acquisitions.

243.  Prior to the formation of the litigation team, Plaintiff had been the sole legal representative for the VECTOR requirement since 2016.

244.  Although Plaintiff did not enter a notice of appearance, was not involved with either of the SRE bid protests, and had no involvement with the decisions of former Army attorneys Michael Kraycinovich and Richard Bechtel to take corrective

actions in those matters in lieu of proceeding to litigation before the GAO, Ms. Cornish informed the client that Plaintiff was the attorney of record.

245.  Mr. Fernandez responded via email on April 9, 2018 to Ms. Cornish, "So we will work with her to get her concurrence and only her concurrence on the BCM."

246.  Because seven or eight attorneys had been involved with various aspects of the VECTOR evaluations, awards and/or protests, Mr. Fernandez felt it necessary to express that he wanted to work with only one attorney.

247.  Upon learning that Mr. Fernandez was seeking Plaintiff's concurrence on the VECTOR BCM, Ms. Cornish who had never provided oversight or supervision on any work assigned to Plaintiff, stated via email to Mr. Fernandez on April 9, 2018, "As her direct supervisor I will need to agree with the approach.  Please provide any documentation which is part of the file after you work with Ms. Spence but prior to taking action."

248.  Upon information and belief, Ms. Cornish was seeking information to support the proposed removal of Plaintiff for unacceptable performance.

249.  Concerned about what Ms. Cornish was asking him to do, Mr. Fernandez, a member of the Senior Executive Service, stated in an email to Ms. Cornish on April 9, 2018, "Candice, this is very unusual.  She needs to coordinate with you if you wish to review her work and concurrence prior to sending it to us.  We cannot be placed in the middle of this.  We will only get one review and concurrence.  If she's the attorney, then we will work thru her and only her.  If she is not or you want to review her work prior to her concurrence, then you will need to work that out internally."

250.  Mr. Fernandez's supervisor, Elegear Primus, sent Ms. Cornish an email on April 9, 2018 which stated, "Please advise on your availability to discuss this requirement.  I am concerned if you are asking Efrain to send you a copy of what your attorney provides to him.  My expectation is that the SAC [Strategic Acquisition Center] receives one input from OGC…"

251.  Mr. Fernandez stated in an email sent to his supervisor, Mr. Kraycinovich and Ms. Cornish on April 10, 2018 that his main concern was that he wanted to work with only one attorney/advisor.

252.  Ms. Cornish advised Mr. Fernandez via email on April 10, 2017 to continue working with the attorney of record (Ms. Spence).

253.  Mr. Fernandez replied that Plaintiff had declined to provide further comments or guidance, "presumably based on internal personnel issues."

254.  As Plaintiff maintained that Mike Kraycinovich and Richard Bechtel were the attorneys of record for the SRE protests, Ms. Cornish continued to assert that Plaintiff who did not enter an appearance for the protests or work on the protests, was the attorney of record.

255.  Upon information and belief, Ms. Cornish's actions in making Plaintiff responsible for the work of other attorneys and for all of the VECTOR protests filed in and after November 2017, even those she did not work on, were an attempt to increase work pressure on Plaintiff who had previously expressed that she did not wish to handle litigation following the David Jones GAO protest which was decided in August 2017.

256.  In an email sent by Ms. Cornish to Plaintiff at 10:35 a.m. on April 10, 2018,
Ms. Cornish stated, "You are the attorney of record in this matter, as you will be should
it go to protest, and I recommend that you discuss the comments below (drafted by
Sarah McWilliams) that I provided…  Please discuss the comments below with Sarah if
needed, but discuss the views with Terrie and work with Terrie to finalize the action
(BCM) for the SAC-F.  You represent the view of OGC and to the extent the CO
disagrees with this advice you will defend any protest."

257.  Upon information and belief, Ms. Cornish's decision to make Plaintiff
responsible for all future VECTOR protests including protests filed as a result of
actions taken by former Army attorneys Michael Kraycinovich, Richard Bechtel, and
Sarah McWilliams, was reprisal for Plaintiff's EEO and whistleblower activity .

258.  In January 2018, Ms. Cornish required Plaintiff to advise the SAC-F client
on the corrective actions proposed by Mr. Kraycinovich and Mr. Bechtel for the two
SRE bid protests Mr. Kraycinovich and Mr. Bechtel handled in December 2017 which
Plaintiff had no involvement with.

259.  Mr. Kraycinovich and Mr. Bechtel were GS-15 trial attorneys.

260.  In April 2018, Ms. Cornish requested that Plaintiff discuss five pages of
comments prepared by Ms. McWilliams with the VA contracting officer after
Ms. McWilliams was requested by Ms. Cornish to review the 166-page VECTOR BCM
which was revised as part of the corrective action proposed by Mr. Kraycinovich and
Mr. Bechtel, the attorneys of record for the SRE protests.

261.  Plaintiff had expended countless hours working with SAC-Frederick personnel and reviewing the evaluation results of hundreds of offerors which culminated in the original BCM that supported contract awards to nearly 70 vendors.

262.  Upon information and belief, Ms. McWilliams, a new hire with 31 years of legal experience, was requested to go behind Plaintiff's work on the BCM and look for flaws and/or deficiencies that would support the April 4, 2018 performance counseling letter issued to Plaintiff six days earlier by Ms. Cornish for unacceptable performance.

263.  When Plaintiff was requested by the client to provide her thoughts on Ms. McWilliams' extensive comments which were sent to the client via email by Ms. Cornish without identifying Ms. McWilliams as the author, Plaintiff responded that she did not want to undermine OGC's position and recommended that the client contact Ms. Cornish or Ms. McWilliams if the client had any questions.

264.  Ms. Cornish informed the client again that Plaintiff was the attorney of record and that Plaintiff would provide the OGC view and litigation support.

265.  Plaintiff responded via email on April 10, 2018 at 11:14 a.m. that she was not the attorney of record for SRE protests .9 and .10 and that Ms. McWilliams was in the best position to answer any questions the client may have concerning the comments Ms. McWilliams prepared.

266.  At 11:35 a.m., Ms. Cornish sent Plaintiff an email which stated, "Please discuss the comments below, with Sarah if needed, but discuss the views with Terrie and work with Terrie to finalize action for the SAC-F.  You represent the view of OGC

and to the extent the CO [contracting officer] disagrees with this advice you will defend any future protest.

267. At 12:26 p.m., Ms. Cornish sent an email to Plaintiff, Mr. Hipolit and Mr. Hogan with a copy to Mr. Fleck which stated, "Ms. Spence is refusing to perform work assignments while at present I cannot reassign. Ms. Spence does not have other work precluding her from performing legal review on this matter. Please advise."

268. In a separate email to Mr. Hipolit and Mr. Hogan that did not include Plaintiff, Ms. Cornish stated that Plaintiff had refused to perform any work and she wanted to know if she had their support for a 714 termination.

269. Without having any personal knowledge of Plaintiff's work or performance and without verifying Ms. Cornish's claims that Plaintiff had refused to perform work, Mr. Hogan who was not in Plaintiff's chain of command and Mr. Hipolit who was Plaintiff's third-line supervisor, notified Ms. Cornish that she had their support.

270. Plaintiff replied to Ms. Cornish's claims that Plaintiff was refusing to perform work via email sent to her at 2:19 p.m. which stated, "Your continued false claims that I refuse to perform work assignments and your unwarranted attacks on me and my work performance are part of a continuing pattern of harassment and retaliation directed at me by you. I have continued to work past my tour of duty hours. I have handled all work assigned to me... It is an abuse of your discretion to make me responsible and accountable for the corrective actions, comments and recommendations of the PrLG attorneys who represented the agency in the SRE protests before GAO. It is also worth noting that at least two of the attorneys are senior

level procurement attorneys and all three attorneys came to VA from the Department of Army."

271.  All of the attorneys involved previously worked for Mr. Fleck at the Army.

272.  Upon information and belief, Mr. Fleck's goal was to replace Agency PLG attorneys with his former staff including, but not limited to, his wife, Mr. Kraycinoch, Sarah McWilliams, Richard Bechtel, and Patrick Turner.

273.  On April 11, 2018, the SAC-Frederick Director, Efrain Fernandez, sent an email to Plaintiff, Ms. Cornish, Mr. Fleck, Michael Kraycinovich, Richard Bechtel, Sarah McWilliams, and others which stated that his office had considered OGC's concerns [prepared by Ms. McWilliams] on the revised BCM and that no further adjustments to the BCM were necessary.

274.  Mr. Fernandez requested Plaintiff's legal concurrence to proceed without further consideration of Ms. McWilliams' comments.

275.  Plaintiff responded via email on April 11, 2018, "... Because I was not involved in the concerns presented in Candice's April 6, 2018 email, I will have to defer to the PrLG leadership for a response to you in this matter…"

276.  In response to Plaintiff's email, Ms. Cornish stated via email to Plaintiff on April 11, 2018, "You may not defer to PrLG you were instructed to review and discuss with the CO.  You do not have to agree but you do need to assess the validity and have a rationale for your position.  However, should one of these issues be raised in a protest please be prepared to defend the agency…"

277.  After the SAC-Frederick Director and contracting officer rejected the comments of Ms. McWilliams, Ms. Cornish continued to request that Plaintiff review Ms. McWilliams' comments, discuss the comments with the contracting officer and assess the validity of the comments.

278.  As a result of Plaintiff's hostile work environment and workplace stress, Plaintiff became ill and another PLG attorney assisted the contracting officer with finalizing the BCM which was the Agency's contract award document.

**Monitoring of Plaintiff**

279.  On April 11, 2018 at 2:44 p.m., Ms. Cornish sent an email to the OGC staff to mute their microphones during an OGC Contract Distinguished Speakers series presentation which could be attended in person or accessed via telephone.

280.  At 3:01 p.m., Ms. Cornish sent Plaintiff an email requesting that Plaintiff confirm that she was on the line and could hear.

281.  Plaintiff replied to Ms. Cornish via email at 4:35 p.m. when the meeting ended and stated she was on the line.

282.  Plaintiff had been on many previous calls where there were technical or auditory problems and Ms. Cornish did not contact her to ask whether she was on the call or could hear.

283.  Upon information and belief, Ms. Cornish did not send emails to all PLG attorneys who teleworked to ask them to confirm they were on the line and could hear.

284.  Upon information and belief, Plaintiff was singled out by Ms. Cornish for the purpose of closely scrutinizing Plaintiff's whereabouts and harassing and/or

disciplining Appellant for not responding in a timely manner to her email or for not responding at all.

285.  Plaintiff filed an EEO complaint alleging she was singled out by Ms. Cornish.

**Exclusion from Meeting and Interference with Plaintiff's Ability to Perform**

286.  Plaintiff was assigned to represent the Agency in the bid protest of AMSG which was filed in the Court of Federal Claims (COFC).

287.  The Department of Justice (DOJ) attorney assigned to the AMSG COFC bid protest advised the Agency via email on April 10, 2018 that VA had a 50-50 chance of prevailing and that neither of the two DOJ attorneys working on the protest saw "an obvious corrective action that the agency could take under the circumstances."

288.  Plaintiff forwarded DOJ's email along with the VA contracting officer's email stating he was in favor of moving forward with litigation to the Procurement Law Group leadership which consisted of Mr. Fleck, Mr. Kraycinovich and Ms. Cornish.

289.  On April 10, 2018, Plaintiff sent an email to Ms. Cornish and Mr. Kraycinovich with a copy to Mr. Hogan, Mr. Hipolit and Mr. Fleck which stated, "... Your responses regarding whether DOJ should proceed with litigation or pursue approval for proposed corrective action is requested.  This matter requires your immediate attention, as well as that of the client..."

290.  No responses were provided to Plaintiff.

291.  To accommodate DOJ's request for an immediate decision from the Agency regarding whether the Agency wish to take corrective action or proceed with litigation, Plaintiff requested that the client, SAC-F, set up a telephonic meeting for April 11, 2018 and extend invitations to the SAC-F leadership and to the PLG leadership.

292.  The PLG leadership did respond to Plaintiff's email and did not accept the client's meeting invitation.

293.  SAC-F personnel and Plaintiff attended the meeting.

294.  In the absence of the PLG leadership, Plaintiff discussed the pros and cons of taking corrective action versus proceeding with litigation extensively with the SAC-F client and let the client which OGC represented, determine how it wished to proceed.

295.  After the SAC-F Director of Acquisitions stated they wished to proceed with litigation, Plaintiff immediately notified the DOJ attorney who was waiting for the Agency's decision.

296.  On April 12, 2018, Ms. Cornish undermined Plaintiff's role as the Agency's legal representative for the AMSG COFC bid protest by excluding Plaintiff from a telephone call she and Mr. Kraycinovich had with the lead Department of Justice (DOJ) attorney responsible for representing the VA before the COFC.

297.  Since being assigned the AMSG protest in early March 2018, Plaintiff had worked independently and exclusively with the DOJ attorneys and SAC-Frederick personnel without the involvement or input of either Ms. Cornish or Mr. Kraycinovich.

298.  One week earlier, Ms. Cornish undermined Plaintiff's role as the Agency's legal representative when she sent an email to the lead DOJ attorney stating that she was Plaintiff's supervisor and disagreed with statements Plaintiff made in an internal agency email not intended for submission to DOJ.

299.  After learning on April 12, 2018 from the DOJ lead attorney that she had received a call from Ms. Cornish and Mr. Kraycinovich that morning, Plaintiff expressed in an email sent to Ms. Cornish on April 12, 2018 that it was inappropriate for her and Mr. Kraycinovich to have a telephonic meeting with the DOJ attorney without including Plaintiff or making Plaintiff aware of the meeting, especially since Plaintiff had been the agency attorney working solely with DOJ to date.

300.  Plaintiff's email stated, "Your last-minute interference in this protest and your unrelenting and continuous harassment of me are placing DOJ and this agency in jeopardy of losing this protest…"

301.  Upon information and belief, Plaintiff's exclusion from the telephonic meeting with DOJ was reprisal for Plaintiff's EEO and whistleblower activity and was intended to acquire negative information from the DOJ attorney without Plaintiff's knowledge about Plaintiff's work and representation in the case which Ms. Cornish could use to support the performance counseling letter issued to Plaintiff eight days earlier which contained no examples of unacceptable performance.

302.  Plaintiff filed an EEO complaint alleging that she was excluded from the DOJ meeting.

303. On April 12, 2018 after Ms. Cornish spoke with the DOJ attorney,

Ms. Cornish sent Plaintiff an email which stated, "Please provide a written copy of the advice you provided [to SAC-F]. Please clearly state your recommendation as to whether litigation is appropriate v. corrective action. I will need you to provide this legal opinion to me by noon on Friday, April 13, 2018."

304. In response to Ms. Cornish's instruction, Plaintiff sent Ms. Cornish an email on April 12, 2018 at 5:23 p.m. which stated, "A decision was made yesterday to move forward with litigation after a verbal discussion with SAC-F personnel of all issues and the pros and cons of proceeding with litigation versus corrective action. As stated in my earlier email, the SAC-F personnel in attendance at the meeting unanimously agreed to proceed with litigation. In accordance with the wishes of the client, I informed the DOJ attorney of the agency's decision. I will not be harassed or bullied by you or anyone else in OGC about the decision made yesterday to continue with litigation of the AMSG bid protest. You, Bob [Fleck] and Mike [Kraycinovich] were invited to the meeting. You and Bob declined the invitation. Mike was not present. You had an opportunity yesterday to provide input regarding whether the agency should litigate or take corrective action. You made a conscious decision not to participate in the discussion or the decision. A decision was made in your absence. Therefore, whether I recommended litigation or corrective action is a moot issue. I don't know what legal opinion you are requesting, but any written advice provided to the client regarding the pros and cons of litigation versus corrective action has already been provided to you."

305.  Three months later on June 11, 2018, Plaintiff received a mid-year review document from Ms. Cornish that stated Plaintiff's April 12, 2018 email was not responsive.

306.  The document stated, "You failed to provide written litigation memo and substantive rationale or analysis regarding your support in this matter.  In addition many of the emails I have been cc'd on relating to this matter show only work from the contracting officer or the Department of Justice attorney, you have provided little substantive legal support damaging VA's position before the court.  This work product does not meet the standards of Quality work required at the GS-14 level."

307.  A proposed removal issued to Plaintiff by Ms. Cornish on September 11, 2018 stated that Plaintiff "failed to follow instruction to draft a litigation memo or show any work product...  As a most recent example, VA has had to reevaluate proposals in the matter of AMSG before the Court of Federal Claims after it was ruled that VA's initial evaluations, which you provided legal review, were found arbitrary and capricious."

308.  Contrary to what was stated in the mid-year review document, the instruction given to Plaintiff on April 12, 2018 stated that Plaintiff was to provide a written copy of the advice she provided [to the client, SAC-F] and state her recommendation as to whether litigation was appropriate v. corrective action.

309.  Even though Plaintiff had not been requested to provide a litigation memo or show her work product for the AMSG bid protest, Ms. Cornish was aware of Plaintiff's work on the protest.

310.  On April 16, 2018 when Plaintiff was on sick leave, Ms. Cornish received an email from the DOJ attorney requesting Ms. Cornish's thoughts on the protest.

311.  Without providing any thoughts, Ms. Cornish replied, "I rely on our discussion of last week as accurate and the legal opinion provided by Jo Spence to you."

312.  Plaintiff kept Ms. Cornish and Mr. Kraycinovich, the head of the litigation team,  up-to-date on the protest progress.

313.  On April 30, 2018, Plaintiff forwarded VA's collective comments which Plaintiff helped to draft and citations for the AMSG bid protest draft Government Reply Brief.

314.  On May 29, 2018, Plaintiff forwarded the new COFC scheduling order.

315.  On June 6, 2018, Plaintiff forwarded the revised draft Motion for Judgment on the Administrative Record which incorporated VA's comments that Plaintiff helped to prepare.

316.  On July 20, 2018, Plaintiff forwarded a detailed COFC Summary of Oral Argument which Plaintiff drafted and the COFC Order issued after oral arguments.

317.  On August 6, 2018, Plaintiff forwarded the COFC AMSG bid protest Opinion.

318.  The attorney of record for the matter before the COFC was the assigned DOJ attorney who filed all litigation documents on behalf of the Federal Government and represented the Agency's interests during oral arguments.

319.  As a precaution against rebuke or other hostile treatment by the PLG leadership which was not in attendance at the April 11, 2018 meeting, Plaintiff did not provide a recommendation to the SAC-F client regarding whether it was appropriate to take corrective action or proceed with litigation for the AMSG COFC bid protest.

320.  In August 2017, Mr. Fleck yelled at Plaintiff during a meeting between PLG attorneys and personnel from the SAC-F client office and blamed Plaintiff for the client's decision not to take the PLG litigation team's recommendation to take corrective action in lieu of proceeding to litigation in the David Jones GAO protest.

321.  The SAC-F client and the litigation team had been in disagreement prior to the meeting regarding the litigation team's recommendation to take corrective action and Plaintiff did not advise the client on the matter or do anything to influence the client's decision to proceed with litigation which was independent and the result of a poll taken by the SAC-F Director during the meeting which resulted in the unanimous decision of the five SAC-F employees in attendance at the meeting.

322.  Plaintiff later complained to Mr. Hipolit, Mr. Fleck and Ms. Cornish about the hostile treatment she was subjected to by Mr. Fleck and Ms. Cornish following the meeting and the Agency's loss of the protest.

323.  Both Mr. Fleck and Ms. Cornish have a history of angry outbursts and yelling at PLG attorneys.

324.  Ms. Cornish also has a history of cursing outloud on a regular and recurring basis and a history of harassing Black female employees over the age of 40.

325.  Years before assuming the position of PLG Deputy Chief Counsel position, Ms. Cornish yelled and cursed at the Office Manager, a Black woman over the age of 40, until she reduced her to tears.

**Reassignment of Point of Use Contract Attorney**

326.  On April 28, 2017, VA Contracting Officer Pattie Beasley sent an email to her PLG legal advisor for the Point of Use (POU) contract, Bridget Grant, which stated, "Nancy and I would like to set up a meeting with you next week to discuss some issues with our position in regards to Shipcom's equitable adjustments…"  Ms. Cornish replied on May 5, 2017 with an email to Ms. Bailey which stated, "Ms. Spence will advise on the subject request for equitable adjustment."

327.  On May 10, 2017, Ms. Bealey informed Plaintiff via email that she wanted to set up a brief call to introduce herself before diving into the POU issues.

328.  Plaintiff spoke with Ms. Bealey and Pattie Bailey on May 11, 2017.

329.  On September 1, 2017,  Ms. Beasley informed Plaintiff via email that she had a modification that required legal review.  Ms. Beasley asked, "How would you like us to send that to you?"

330.  Plaintiff replied, "Please forward your modification to Candice Cornish…"

331.  At the time, all actions for legal review had to go through Ms. Cornish.

332.  On September 20, 2017, Ms. Beasley informed Plaintiff that she had negotiated an equitable adjustment with Shipcom and requested that Plaintiff review the draft modifications and the release language.

333.  Thirty minutes later, Plaintiff sent Ms. Beasley an email that stated, "I have reviewed the proposed original and the revised modification language… Let me know if you require further assistance."

334.  On April 23, 2018, Ms. Beasley informed Plaintiff that she and Nancy Bailey had been working on payment claims since their last communication with Plaintiff in September 2017 and they needed a way forward with all of the claims.

335.  Plaintiff forwarded Ms. Bailey's request for legal assistance to Ms. Cornish for assignment.

336.  Ms. Cornish assigned Plaintiff to handle the reviews of the claims that stemmed from a contract Plaintiff had no history with.

337.  In an email to Ms. Cornish on April 23, 2018, Plaintiff stated, "...Requiring that I replace Bridget as the transactional attorney on a contract she previously advised the client on for a number of years is not only an inefficient response to meeting the needs of the client… it is a break from PrLG past practices and protocol. As the attorney with the contract history and personal knowledge of the contract problems and claims issues, it would be more appropriate and more efficient to have Bridget continue working with her client on the outstanding contract claims."

338.  Upon information and belief, Plaintiff was assigned to replace Ms. Grant who had been a legal advisor on the POU contract since its inception in or around 2013, in order to increase work pressure on Plaintiff who had been given a performance counseling letter on April 4, 2019 which stated that her work performance was unacceptable.

339.  On April 24, 2018, Plaintiff sent an email to Ms. Bailey which stated, "Since I have been officially assigned to assist you with the REAs… I will do what I can to assist you in this regard.  My involvement with the contract claims is highly unusual, given that I was not the attorney for the contract and did not participate in any of the meetings…"

340.  Ms. Bailey replied that she did not see how this would work [Plaintiff being assigned] because Plaintiff was not involved before.

341.  Ms. Bailey asked Plaintiff if she should discuss the matter up the chain and Plaintiff recommended that she contact Ms. Cornish.

342.  In an email to Ms. Cornish on April 24, 2018, Ms. Bailey stated, "It appears this contract was assigned from Bridget to Jo…  We have slowly been working on direct cost REA's [requests for equitable adjustment]… we know that delay claims are coming…"

343.  On April 27, 2018, Plaintiff sent Ms. Bailey an email which stated, "... To assist me in this endeavor, I request that you provide me with all relevant pre-award and post-award contract documents…"

344. On May 8, 2018, Plaintiff sent Ms. Bailey an email requesting that she provide a status on the information Plaintiff requested.

345.  Ms. Cornish was aware at the time she assigned Plaintiff to handle the POU contract payment claims that the POU contract was plagued with problems and the contract was the subject of ongoing investigations by the VA OIG.

346.  Upon information and belief, Ms. Cornish assigned Plaintiff to a contract fraught with problems three weeks after giving Plaintiff a performance counseling letter in order to ensure Plaintiff's failed performance.

347. A "Mid-year Progress Review Feedback" document issued by Ms. Cornish to Plaintiff in June 2018 stated, "In April [2018], I learned of your failure to review and be responsive to client office and to your fellow line attorney in the matter of Point of Use contract claims.  You were first assigned to assist in the matter in May of 2017.  However, both on September 1 and 11 of 2017 you tell the client to send the underlying request elsewhere rather than assisting.... On April 23, 2018 at 9:51am you then demand an explanation as to why you received assignment in the same Point of Use matter.  It is both within my purview and discretion to assign matters but here specifically you were assigned this matter almost a year prior to the allegations you make in lieu of handling the matter assigned.  I was then forced to reassign the matter to another attorney to ensure the agency was not harmed due to your intermittent performance/provision of legal services and ensuing refusal to perform."

348.  The proposed removed issued to Plaintiff in September 2018 stated, "Absence of documents as no end product was produced.  Reassigned to another attorney."

349.  The notice further stated, "On May 5, 2017, you were tasked with assisting via an email from me instructing you to provide legal assistance however there is no evidence you provided legal review to the client.  Then in March of 2018 the client subsequently re-requested assistance and at that time I was forced to reassign the

matter.  Despite having originally received assignment in 2017 you then refused to accept the assignment to provide legal review of the claims submitted by the contractor to our client."

350.  With knowledge that Plaintiff completed reviews of both modifications on September 20, 2017, the Agency maintained for purposes of removing Plaintiff that Plaintiff had not completed the assignments in 2017 and they had to be reassigned to another PLG attorney.

**Exclusion from Primary Client Meeting**

351.  On May 16, 2018, Plaintiff was excluded from a meeting held at VA's Central Office in Washington, DC between Strategic Acquisition Center (SAF) personnel which included senior leaders from SAC offices located in Frederick, Maryland and Fredericksburg, VA, Ms. Cornish, and PLG who did work for the SAC client.

352.  Plaintiff, the longest serving legal representative to the SAC, was not issued an invitation to the meeting or made aware of the meeting before it occurred.

353.  In response to an email from Plaintiff questioning Plaintiff's exclusion from the meeting, Ms. Cornish stated Plaintiff was not invited because her work assignments were not being discussed.

354.  Meeting attendees reported that with the exception of an action one attorney (Ms. Grant) was working on which resulted in a decision to discuss the matter offline, no attorney work assignments were discussed during the meeting.

**Request for Desk Audit**

355.  In an email Plaintiff sent to Ms. Cornish Mr. Hogan, Mr. Fleck, Attorney Danielle Kalivoda, and Jelena Zekanovic of the Human Resources Office on May 30, 2018, Plaintiff stated, "I view my exclusion from the meeting with SAC-F, the significant reduction in my work assignments over the past seven months, the unwarranted disciplinary actions which include various counseling letters and a letter of admonishment... to be part of a continuing pattern of discrimination and retaliation by you and Bob [Fleck] that has made my work environment extremely hostile."

356.  Plaintiff further stated, "I also note that while I was being harassed and falsely accused of failing to perform the duties of my job in order to justify giving me a performance counseling letter requiring that I improve my performance, you and Bob were hiring GS-15 attorneys from outside the agency to perform the same duties I have been performing at the VA for the past 11 years at the GS-14 level.  For this reason, I am requesting that 02 and VHACLE perform an audit of my position and re-classify my duties at the GS-15 level.  I also request that I be included in all future meetings between SAC-F and the Procurement Law Group attorneys and that all acts of discrimination and retaliation cease."

357.  Ms. Cornish forwarded Plaintiff's request to the Human Resources Office the morning of May 30, 2017.

**Proposed Suspension**

358.  On the afternoon of May 30, 2017, Ms. Cornish issued Plaintiff a proposed three-day suspension for alleged inappropriate conduct which included four specifications (A-D).

359. Specification A which referenced February 6, 2018 a conference call stated, "... you interrupted me, raising your voice to a level that was combative and disrespectful in tone and nature.  Furthermore, you kept interrupting, repeatedly speaking over me and your colleague, Mr. Michael Kraycinovich...  I found your conduct to be inappropriate, rude and unequivocally disrespectful."

360.  Plaintiff was advised nearly four months after the conference call took place that her conduct during the call was inappropriate.

361.  Specification B stated, "On Wednesday January 31, 2018, I requested that you coordinate OGC response to a client office as the transactional attorney handling a significant matter.  You refused to provide information to the attorneys involved and were non-responsive to their phone calls and emails to you...  I found your conduct to be inappropriate, rude and unequivocally disrespectful."

362.  Plaintiff did not refuse to provide information to the Army attorneys involved and was responsive to all phone calls and emails.

363.  Specification C stated, " On Friday April 13, 2018 you sent me an email and carbon copied few of my superiors.  The email stated in part: 'You have shown through your actions that you are deceptive and don't tell the truth, you cannot control your anger, and you are threatened by attorneys who are more competent and more

intelligent than you.  Hence, your claim that my communications to you are unintelligible…' I found your conduct to be inappropriate, rude and unequivocally disrespectful."

364.  Plaintiff's email was in response to the April 4, 2018 performance counseling letter given to Plaintiff by Ms. Cornish which contained nearly 30 statements alleging Plaintiff's failed performance with no examples provided to support the allegations made.

365.  Specification D stated, "Throughout the week of April 8th, ending Friday April 13, 2018 you would include clients on emails, in which you were being argumentative with me and declining to provide guidance to clients.  I found your conduct to be inappropriate, rude and unequivocally disrespectful."

366.  Ms. Cornish's claims were baseless and without merit.

367.  The dates proposed for the suspension were July 9-11, 2018.

368.  Plaintiff provided a detailed response to Ms. Cornish's proposed suspension on June 13, 2018 and filed an internal grievance on July 5, 2018.

369.  Plaintiff also filed an EEO complaint alleging discrimination and retaliation.

370.  In response to the grievance filed by Plaintiff, Specifications A and C were sustained in a report prepared on August 24, 2018 by the Office of General Counsel's not so neutral grievance examiner, Sonja Cromwell, a former PLG attorney and Chief Counsel of the Agency's Information Law Group.

371.   On October 5, 2018, Plaintiff received a decision from Mr. Hogan which stated, "Ms. Cromwell sustained Specifications A and C, but did not sustain Specifications B and D.  Proving at least one specification, however, satisfies the required burden to support the charge.  I find the penalty is appropriate for the upheld specifications and charge… I am, therefore, denying your grievance."

372.   In determining the penalty for Plaintiff's alleged inappropriate behavior, no consideration was given to the *McDonnell Douglas* factors.

373.   In an email to Mr. Hogan on October 5, 2018, Plaintiff requested that he reconsider his decision sustaining the three-day suspension.

374.   Plaintiff's email stated, "I request an 'impartial review' of the suspension action, as it appears from Ms. Cromwell's draft decision that she was not impartial. Given that Ms. Cromwell used to work for 025 and maintains close ties to employees and former employees of the office, I am concerned that Ms. Cromwell's decision which contained statements which were factually inaccurate, failed to consider all of the evidence including mitigating factors, failed to consider my tenure and history of conduct as an attorney of 32 years with 12 of those years with the VA, failed to consider the past conduct of my accusers including their history of yelling, and failed to consider claims I made that Candice [Cornish] deliberately and repeatedly spoke over me and interrupted me during a staff meeting, was written to favor Management.  In addition, I believe it was not appropriate for Ms. Cromwell to issue findings regarding the appropriateness of my conduct without an investigation to determine the veracity of the evidence she considered in reaching her findings…"

375.  Plaintiff's email further stated, "Since I was not aware that I was suspended on July 9-11, 2018 and worked on those dates, I am requesting three days off work.  Candice was aware that I was working on those dates and she said nothing. She therefore acquiesced in my performing the duties of my job during the days she later claimed I was suspended.  Because I filed a grievance of the suspension decision, it was reasonable for me to believe that the grievance filed staying the [suspension].  Lastly, I am requesting an immediate transfer out of the Procurement Law Group.  I should not have to continue working in a hostile work environment where I am being continually harassed and retaliated against.  I was saddened this week by the news of LT Burleson's death.  I am now concerned that the harassment he endured in the Procurement Law Group which he shared with me and others may have contributed to his demise."

376.  No response was received from Mr. Hogan.

377.  Upon information and belief, the proposed suspension was given to Plaintiff in retaliation for Plaintiff's EEO and whistleblower activity which included claims that attorneys hired by Mr. Fleck from the Department of the Army were not needed, were improperly hired, and were not performing the duties of GS-15 trial attorneys, but were instead performing the duties of the GS-14 contracts attorneys.

378.  Within minutes of emailing Plaintiff the proposed suspension, Ms. Cornish emailed a counseling letter to a Black female GS-14 attorney over the age of 40 who also requested an audit of her position after learning that attorneys hired as GS-15 trial attorneys were performing the same work as the GS-14 attorneys.

379. The only attorneys given counseling letters by Ms. Cornish and Mr. Fleck since 2016 were attorneys over the age of 40.

380. Upon information and belief, Mr. Hogan's decision to uphold the suspension of Plaintiff was reprisal for Plaintiff's EEO and whistleblower activity which included complaints containing information that contradicted Mr. Hogan's claims that there was a shortage of procurement attorneys and the attorneys were working beyond a reasonable capacity.

**Mid-year Review**

381. On June 11, 2018, Ms. Cornish issued Plaintiff a document entitled "Mid-year Progress Review Feedback" which was purported to be a mid-year review for a performance rating period that started on October 1, 2017.

382. The document contained knowingly false statements alleging that Plaintiff refused to perform and failed to perform.

383. Many of the statements attributed to Plaintiff in the document were deliberately taken out of context to change their meaning and crucial information was intentionally left out of the document in order to twist the facts and distort the truth.

384. Plaintiff submitted a detailed response to Ms. Cornish with copies sent to Mr. Fleck and the VA Office of General Counsel leadership.

**Inappropriate Conduct During Staff Meeting**

385. On June 12, 2018, Plaintiff reported to Ms. Cornish's superiors that

Ms. Cornish acted inappropriately during a staff meeting call when she talked over Plaintiff repeatedly and cut her off several times when Plaintiff tried to ask questions during the call.

386.  In response to Plaintiff's claims, Ms. Cornish issued a "Memo for Record" with the subject, "Inappropriate Conduct," which stated that Plaintiff spoke over her during the meeting.

387.  Plaintiff filed an EEO complaint regarding the Memo for Record and claims made by Ms. Cornish that Plaintiff's conduct was inappropriate.

**Client Request for Assistance**

388.  On July 30, 2018, Plaintiff received an email from Ms. Cornish at 9:17 a.m. which stated, "Please provide background on this matter (purpose/strategy) as well as current status."  The subject line read, "Client Request for Assistance:  NX products."

389.  Plaintiff sent Ms. Cornish an email 20 minutes later which stated, "Please forward the client request you are referring to."

390.  Ms. Cornish replied, "I am referring to the IPT [Integrated Product Team] for NX Stereotatic ENT Navigation Systems."

391.  Unable to find an IPT for NX Stereotatic ENT Navigation Systems, Plaintiff sent Ms. Cornish an email that contained background information for the NX [non-expendable] procurement Plaintiff reviewed on July 17, 2018 for Stryker stretchers.

392.  Plaintiff attached the weekly NX procurements spreadsheet which showed the status for all NX procurements.

393.  Plaintiff also provided Ms. Cornish with the names of the NX Procurement IPT co-chair and the name of the SAC contract administrator.

394.  Plaintiff received no response or communication from Ms. Cornish.

395.  One week later on August 7, 2018, Plaintiff ran across the NX EQ Stereotactic Navigation System agency protest and immediately forwarded all information Plaintiff had on the protest to Ms. Cornish.

396.  Plaintiff's email included the email Plaintiff had sent to Ms. Cornish, Mr. Fleck and Mr. Kraycinovich on May 2, 2018 which contained a summary of the protest meeting Plaintiff attended with the client.

397.  No response or communication was received from Ms. Cornish.

398.  Upon information and belief, Ms. Cornish's claims related to the NX equipment procurements and all other claims and allegations proffered to support Plaintiff's removal were made in retaliation for Plaintiff's EEO activity and whistleblower complaints and disclosures, including those made to the VA Office of Inspector General (OIG) Hotline in May 2018.

399.  This matter was included in a proposed removal issued to Plaintiff by Ms. Cornish on September 11, 2018 to support Ms. Cornish's claims that Plaintiff's performance was unacceptable for two critical elements.

400.  For the "Stakeholder Services" critical element, the proposed removal stated, "Failure to take actions as needed as no end product was produced."

401.  For the "Quality of Legal Products" critical element, the proposed removal stated, "Absence of documents as no end product rather attorney copied and pasted information created by the client."

402.  The proposed removal given to Plaintiff identified a charge of "Unacceptable Performance" with three specifications.

403.  Specification 1:  "Failure of Critical Element - Stakeholder Services" stated that Plaintiff refused to work or show work product in eight instances, requiring supervisory intervention.

404.  Specification 2:  " Failure of Critical Element - Quality of Legal Products" stated that only one of nine cases randomly selected for review met the standard.

405.  Specification 3:  "Failure of Non-Critical Element - Timeliness" stated Plaintiff failed to assist client stakeholders in a timely manner.

406.  In addition to the examples of unacceptable performance identified in the proposed removal, the Agency included over 200 pages of emails as attachments which contained other unidentified examples of alleged unacceptable performance the Agency intended to use against Plaintiff to support the unacceptable performance charge.

407.  Upon information and belief, the Agency attempted to deceive Plaintiff who had only a short time to respond to the charge, by not specifically identifying all examples of alleged unacceptable performance in the text of the proposed removal document.

408.  Plaintiff submitted a response to the proposed removal which denied all claims that she failed to meet the identified performance standards.

409.  Plaintiff's response also noted the inconsistencies in the claims of unacceptable performance contained in the Mid-year Progress Review Feedback document she was given on June 11, 2018 versus the claims contained in the proposed removal.

410.  The evidence provided by the Agency to support the unacceptable performance charge against Plaintiff did not support the claims made.

411.  The Agency's claims that Plaintiff's performance was unacceptable was not only refuted by Plaintiff in her response to the proposed removal, but challenged by many of Plaintiff's clients who sent emails to Mr. Fleck's supervisor, Michael Hogan, to express their support for Plaintiff.

412.  Some of Plaintiff's clients stated they were in utter shock and/or disbelief that Plaintiff had been proposed for removal.

413.  Despite evidence presented by Plaintiff which showed the Agency's charge of unacceptable performance was baseless and lacked merit, Mr. Fleck issued Plaintiff a termination letter dated October 26, 2018.

414.  Upon information and belief, the termination letter given to Plaintiff was reprisal for Plaintiff's EEO and whistleblower activity which included complaints and disclosures of information to the OIG and OSC which Plaintiff believed evidenced a gross waste of funds and an abuse of authority.

**Affirmative Defenses**

415.  All discipline-based and performance-based personnel actions taken against Plaintiff including the November 16, 2017 counseling letter, the December 4, 2017 admonishment letter, the December 21, 2017 "Fully Successful" rating, the January 29, 2018 counseling letter, the April 4, 2018 performance counseling letter, the May 30, 2018 proposed three-day suspension, the June 11, 2018 Mid-year Progress Review Feedback, the September 11, 2018 proposed removal, the October 5, 2018 suspension decision, and the October 25, 2018 letter terminating Plaintiff's employment constitute prohibited personnel practices under the Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(8) and (9), as these actions were taken in retaliation for Plaintiff's disclosure of information to her supervisors and other managers within the VA Office of General Counsel, the OIG and the OSC which Plaintiff believed evidenced a gross waste of funds and an abuse of authority and because Plaintiff exercised her right to file whistleblower complaints.

416.  The Agency's discrimination against Plaintiff based on her age, race, and sex, as set forth in the 19 events contained in Plaintiff's amended November 6, 2017 EEO complaint, is a prohibited personnel practice under 5 U.S.C. 2302(b)(2) and a violation of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

417.  The Agency's retaliation against Plaintiff for engaging in EEO activity is a prohibited personnel practice under 5 U.S.C. 2302(b)(9).

418.  The hostile work environment Plaintiff was subjected to which was created by the Agency is a violation of the Whistleblower Protection Act of 1989.

419.  The Agency's failure to obtain the approval of the OSC before terminating Plaintiff is a harmful procedural error and a violation of the VA Accountability and Whistleblower Protection Act of 2017.

420. The removal of Plaintiff was not warranted and did not promote the efficiency of the federal service.

421.  The Agency's decison to terminate Plaintiff Plaintiff was motivated by discrimination against her on the basis of race, sex and age and by reprisal for her EEO and whistleblower activity.

## CAUSES OF ACTION

## COUNT I

**(Discrimination on the Basis of Race, Sex and Age in Violation**

**of the Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(2),**

**Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-16, and**

**the Age Discrimination in Employment Act of 1967, 29 U.S.C. 633a)**

**and**

**(EEO Reprisal, in violation of the Whistleblower Protection Act,**

**5 U.S.C. 2302(b)(9))**

422.  The foregoing allegations are incorporated as if re-alleged herein.

423. Plaintiff maintains that her removal was motivated by her EEO activity and that the Agency took personnel actions against her because she exercised her right to

71

file an EEO complaint against the Agency, in violation of the Whistleblower Protection Act.

424.  Plaintiff engaged in activity protected by the Whistleblower Protection Act of 1989, 5 U.S.C. 2302(b)(1) and (b)(9), Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-16, and the Age Discrimination in Employment Act of 1967, 29 U.S.C 631 and 633a.

425.  Plaintiff filed an EEO complaint against Ms. Cornish and Mr. Fleck on November 6, 2017.

426.  Plaintiff's complaint was amended several times after it was filed and included 19 events that occurred between November 2017 and October 2018.

427.  Plaintiff maintains that she was discriminated against on the basis of her race, sex and/or age and retaliation when the Agency did the following:

(a) Required only Plaintiff to email her supervisor each day between November 1, 2017 and December 29, 2017 to state when her workday started;

(b) Reduced Plaintiff's workload and diminished Plaintiff's responsibilities;

(c) Issued Plaintiff a written counseling for "Conduct Unbecoming a Federal Employee" on November 16, 2017 for a single factual statement made by Plaintiff to Ms. Cornish in an email on October 31, 2017;

(d) Issued Plaintiff a letter of admonishment on December 4, 2017 that contained false claims that Plaintiff was absent from a staff meeting call on November 14, 2017;

(e) Issued Plaintiff a counseling letter on January 29, 2017 for not announcing Plaintiff's presence on the November 14, 2017 call prior to the end of the meeting when Plaintiff had not previously been made aware of such requirement;

(f) Failed to approve Plaintiff's November 21, 2017 use or lose leave request in time for Plaintiff to take leave on December 6, 2017 as planned;

(g) Issued Plaintiff a "Fully Successful" rating on December 21, 2017 which was two levels lower than the "Outstanding" rating Plaintiff received one year earlier;

(h) Denied Plaintiff's request to change her tour of duty hours on March 5, 2018 when another attorney performing the same duties and serving the same client as Plaintiff, worked the same hours;

(i) Added restrictive terms to the 2018 Telework Agreement in March 2018 which targeted Plaintiff, a full-time teleworker;

(j) Falsely accused Plaintiff of refusing to perform work assignments on April 10, 2018;

(k) Harassed Plaintiff and singled her on April 11, 2018 to ask if she was on a call and could hear;

(l) Excluded Plaintiff, the Agency's sole legal advisor for the AMSG bid protest before the U.S. Court of Federal Claims, from a call with Department of Justice attorneys on April 12, 2018 to discuss the protest.

(m) Denied Plaintiff's requests for a transfer and the transfer request of a similarly situated employee;

(n) Excluded Plaintiff from a meeting on May 15, 2018 between personnel from the Strategic Acquisition Center (SAC) Frederick and Fredericksburg, including senior leaders, and PLG attorneys who did work for the SAC, the PLG's primary client.

(o) Issued Plaintiff a proposed three-day suspension for alleged inappropriate behavior in May 2018 and suspended Plaintiff in July 2018 based on false claims made by Ms. Cornish and Richard Bechtel who previously worked for Mr. Fleck at the Department of the Army;

(p) Issued Plaintiff a Mid-year Progress Review Feedback on June 11, 2018 which contained false statements and allegations to support Ms. Cornish's claims that Plaintiff's performance was unacceptable;

(q) Gave Plaintiff a "Memo of Record" for alleged inappropriate conduct during a staff meeting on June 12, 2018after Plaintiff complained of Ms. Cornish's inappropriate conduct towards her on June 12, 2018 in an email sent to Ms. Cornish and her superiors which stated that Ms. Cornish repeatedly talked over Plaintiff while she was speaking and attempted to cut her off when she asked questions;

(r) Issued Plaintiff a Notice of Proposed Removal on September 11, 2018 based on false claims that Plaintiff failed to perform and her performance was unacceptable; and

(s) Removed Plaintiff in October 2018 based on false claims of unacceptable performance and without securing the requisite approval of the OSC.

428.  Plaintiff maintains that in a concerted act of reprisal intended to force her out of her job, Plaintiff's supervisors and other Agency officials engaged in a continuing pattern of discrimination, harassment and retaliation against Plaintiff and that discrimination based on Plaintiff's race, sex and/or age and reprisal against Plaintiff for exercising her right to file a complaint were motivating factors that contributed to Plaintiff's termination.

429.  There was a causal connection between Plaintiff's protected activity over a one year period and the adverse employment and personnel actions taken against Plaintiff, as evidenced by the Plaintiff's receipt of a counseling letter from Ms. Cornish just 10 days after Plaintiff filed an EEO complaint against Ms. Cornish and Mr. Fleck.

430.  As a direct and proximate result of the foregoing, Plaintiff suffered damages and injury including lost wages and benefits, injury to her professional and personal reputation, career and career prospects including opportunities for advancement and promotion within the Agency, and lost or jeopardized future employment.

431.  As a direct and proximate result of the foregoing violations, Plaintiff suffered physical harm, emotional distress, personal embarrassment, and humiliation.

432.  Plaintiff demands judgment against Defendants for all damages available by statute and common law including, but not limited to, pain and suffering, compensatory and enhanced compensatory damages, lost wages, back pay, front pay, attorneys fees, any and all other damages to which Plaintiff is entitled including all interest which is within the jurisdictional limit of this Court.

## COUNT II

## (Whistleblower Reprisal in Violation of the Whistleblower

## Protection Act of 1989, 5 U.S.C. 2302(b)(8) and (b)(9))

433.  The foregoing allegations are incorporated as if re-alleged herein.

434.  Plaintiff maintains the Agency took personnel actions against Plaintiff in retaliation for disclosures of information Plaintiff made to the Inspector General of the Agency and to the Special Counsel which Plaintiff believed evidenced a gross waste of funds and an abuse of authority.

435.  Plaintiff filed a complaint with the Agency OIG in May 2018 which alleged that attorneys who previously worked for Mr. Fleck at the Department of the Army were improperly hired by him as full-time GS-15 trial attorneys for the VA Procurement Law Group and that the attorneys hired were not needed and were performing the same work as Plaintiff and other GS-14 procurement attorneys.

436.  Plaintiff filed a similar complaint with the OSC in September 2018, after Plaintiff was proposed for removal.

437.  In an email Plaintiff sent to Ms. Cornish on October 30, 2017 with a copy to Mr. Fleck and his supervisor, Mr. Hipolit, VA Deputy General Counsel for Logistics, Plaintiff stated, "The lower number of assignments and the type of work being assigned to me is not commensurate with my skill level or my 31 years of experience as an attorney…  As a supply fund attorney and the longest serving attorney for SAC-Frederick which has been my primary client, I should be receiving a fair share of that office's work, in addition to other assignments. If there are not enough work

assignments for attorneys within PLG, I question whether there is a need to hire additional attorneys."

438.  An email Plaintiff sent to Mr. Hipolit on October 31, 2017 stated Plaintiff's concern regarding the lack of work for PLG attorneys and questioned plans underway at that time to hire five to six additional attorneys.  Plaintiff requested that a review be conducted of the need to hire additional attorneys, as well as the process for promotion of PLG attorneys.

439. An October 31, 2017 email sent by Plaintiff to Ms. Cornish with a copy to Mr. Hipolit and Mr. Fleck stated, "As a supply fund attorney, I should be receiving an equitable share of PLG work that is supply funded…  Over the past 11 years, I have made significant contributions to VA OGC and have received many recognitions from my clients and others in the agency for those contributions, including the receipt of an ICARE award from the Director, SAC-Frederick, in March of this year.  I stand ready to continue contributing to the workload of this office and the mission of this agency.  At a time when VA attorneys and legal offices are asking for more resources, it is absolutely incomprehensible that any PLG attorney would not be receiving work assignments."

440.  Despite Plaintiff's stated concerns regarding the lack of work within the Procurement Law Group and Management's plans to hire additional attorneys, on November 7, 2018, Mr. Hipolit gave his written approval for the position description that supported the hiring of GS-15 trial attorneys for the Real Property Law Group, the Procurement Law Group and the District Contracting National Practice Group.

441.  Mr. Hogan pitched the need for the positions to the VA General Counsel, claiming there was a shortage of attorneys in the Agency's three contracts law groups.

442.  Mr. Fleck advocated for and selected attorneys who previously worked for him at the Department of the Army to fill positions intended for Agency attorneys when he knew the attorneys were not needed and would be surplus, due to the lack of work available for attorneys in the PLG.

443.  Mr. Hipolit approved the new hires for the PLG, with knowledge that Plaintiff did not have a full workload and was concerned about whether there would not be enough work for all attorneys to be gainfully employed, if additional attorneys were hired.

444.  The attorneys selected by Mr. Fleck to fill the PLG GS-15 Trial Attorney vacancies were identified as Sarah McWilliams, Richard Bechtel, Patrick Turner, and Michael Kraycinovich who was hired prior to the date Mr. Hipolit provided approval for the GS-15 trial attorney position description and selections.

445.  Ms. McWilliams, Mr. Bechtel, Mr. Turner, and Mr. Kraycinovich worked for Mr. Fleck at the Department of the Army.

446.  Upon information and belief, Ms. McWilliams and Mr. Bechtel joined the Agency at the end of 2017.

447.  Upon information and belief, Mr. Turner joined the Agency in or around March 2018.

448.  At the time Mr. Hipolit provided his approval for the PLG new hires from the Department of the Army, he was aware that the GS-15 Trial Attorney positions were intended for existing Agency procurement attorneys.

449.  No existing Agency attorneys were selected by Mr. Fleck to fill any of the GS-15 trial attorney openings allotted for the PLG.

450.  Mr. Bechtel reported after being hired to work for the PLG that he had very little procurement experience.

451.  Upon information and belief, Mr. Fleck advocated for the selection of his former employees at the GS-15 level with the support of Ms. Cornish, because he wanted to replace PLG attorneys with his prior staff who occupied GS-15 positions under his supervision at the Department of the Army.

452.  The appointments of the Army attorneys at the GS-15 level placed them above all existing PLG attorneys.

453.  Instead of doing trial work as the job announcement required, the new hires were performing the same work as Plaintiff and other PLG attorneys who were GS-14 contracts attorneys responsible for providing legal advice and guidance on all aspects of procurement, including litigation.

454.  Plaintiff complained in an email sent to Mr. Hipolit on February 26, 2018 that "PLG has so many attorneys that there is not enough work for all of us to be gainfully employed.  Most Days, I have few, if any, work assignments."

455.  On March 5, 2018, Plaintiff sent an email to Ms. Cornish with a copy to

Mr. Hipolit and Mr. Fleck that stated, "As far as workload is concerned, I have barely had any work to speak of since early January 2018. I have complained repeatedly that there are too many PLG attorneys and not enough work for all."

456.  A March 7, 2018 email sent by Plaintiff to Ms. Cornish with a copy to Mr. Hipolit and Mr. Hogan stated, "... there is not currently enough work for all PrLG attorneys to have a full workload."

457.  An April 24, 2018 email Plaintiff sent to Mr. Hipolit with a copy to the Agency General Counsel, James Byrne, and Mr. Hogan stated, "... given the OIG report involving the hiring of Bob's wife which I was not aware of until the report was brought to my attention, I am requesting that 02 [Office of General Counsel] review the PrLG's hiring of three attorneys from the Army to ensure that those positions were properly filled. According to the attorneys hired, they worked with Bob at the Army. At the same time these attorneys were hired under the guise of the PrLG needing more resources, I complained repeatedly to you that I was not being given work assignments. With the addition of the Army attorneys, two and three attorneys are now being assigned to review actions which historically have required review by only one attorney. I am still not being providing [provided] work assignments that are commensurate with my grade or skills…"

458.  After receiving no assistance or relief from the VA OGC leadership, Plaintiff filed a complaint with the Agency OIG on May 21, 2018 alleging that prohibited personnel practices had been committed within the VA Procurement Law Group.

459.  An email sent by Plaintiff on May 30, 2018 to Ms. Cornish with copies to

Mr. Hogan, Mr. Fleck, VA Attorney Danielle Kalivoda, and Jelena Zekanovic of the Human Relations Office, stated, "...While I was being harassed and falsely accused of failing to perform the duties of my job in order to justify giving me a performance counseling letter requiring that I improve my performance, you and Bob [Mr. Fleck] were hiring GS-15 attorneys from outside the agency to perform the same duties I have been performing at the VA for the past 11 years at the GS-14 level...

460.   A May 30, 2018 email sent by Plaintiff to Mr. Byrne, Mr. Hogan and Mr. Hipolit following Plaintiff's receipt of a proposed three-day suspension from Ms. Cornish on May 30, 2018 for alleged inappropriate conduct stated, "...The remaining accusers are fairly new to the VA and used to work for Bob at the Army. Given that they stand to benefit from the GS-15 positions 'given' to them by their previous boss, it goes without saying that they are loyal to Bob and cannot be relied upon to tell the truth.  I learned this afternoon that another long-time Black female Procurement Law Group attorney over the age of 40 received a counseling letter from Candice [Ms. Cornish] today which signals the start of unwarranted progressive disciplinary action against her.  That attorney and I questioned the Procurement Law Group's hiring practices which led to the hiring of multiple attorneys from the Army at the GS-15 level without consideration being afforded to us and other VA attorneys for these positions... I have been the victim of a continuing pattern of discrimination and retaliation to include harassment and hostile work environment since October 2017 and currently have 14 claims pending investigation by the Office of Resolution Management... In addition to making the Office of Resolution Management aware of

the proposed suspension, I have taken additional steps to ensure that other offices are aware as well. With 32 years as an attorney, I do not plan to sit idly by while those who have engaged in or benefitted from prohibited personnel practices conspire to malign my character and levy unwarranted disciplinary actions against me, in an attempt to remove me from my job. It is clear that Bob wants my job and that the unwarranted disciplinary actions and attacks on my work performance have been motivated by a desire to replace me with an attorney of his choice. The significant decrease in my work assignments since October 2017, my exclusion from meetings with clients and others, and the false claims made by the Procurement Law Group leadership that my behavior has been inappropriate constitute a gross misuse and abuse by the Procurement Law Group leadership of the positions they occupy and the authority granted to them as supervisors. If Bob wanted to be surrounded by the attorneys he used to supervise, he should have stayed at the Army. The position I currently occupy is not available!"

461.  On June 11, 2018, Plaintiff was given a "Mid-year Performance Review Feedback" document by Ms. Cornish which contained false allegations and claims that Plaintiff's work performance was unacceptable.

462.  Plaintiff's response to the mid-year review contained a chronological list of all of the unwarranted disciplinary-based and performance-based actions issued to Plaintiff since November 2017.

463.  The list included a November 16, 2017 letter of counseling issued 10 days after Plaintiff filed an EEO complaint and 17 days after Plaintiff first made

whistleblower disclosures she believed evidenced a gross waste of funds and an abuse of authority.

464. The list also included a December 4, 2017 admonishment letter, a December 21, 2017 reduced performance evaluation and rating from "Outstanding" the previous year to "Fully Successful," a January 29, 2018 letter of counseling, an April 4, 2018 letter of counseling for unacceptable performance, and a May 30, 2018 Notice of Proposed Suspension for alleged inappropriate conduct.

465. Subsequent personnel actions included a September 11, 2018 proposed removal and a termination letter dated October 26, 2018.

466. Plaintiff maintains that her disclosure of information to her superiors, the VA OIG and OSC which she believed evidenced a gross waste of funds and an abuse of authority, Plaintiff's exercise of her right to file complaints, and Plaintiff's cooperation with the Inspector General and the Special Counsel were motivating factors in the Agency's decision to terminate Plaintiff.

467. Plaintiff further contends that all adverse employment and personnel actions taken against Plaintiff by the Agency were motivated by Plaintiff's whistleblower activity.

468. As a direct and proximate result of the foregoing violations, Plaintiff suffered damages and injury including lost wages and benefits, injury to her professional and personal reputation, injury to her career and career prospects including opportunities for advancement and promotion, and lost or jeopardized future employment.

469.  As a direct and proximate result of the foregoing violations, Plaintiff suffered physical harm, emotional distress, personal embarrassment, and humiliation.

470.  Plaintiff demands judgment against Defendants for all damages available by statute and common law including, but not limited to, pain and suffering, compensatory and enhanced compensatory damages, lost wages, back pay, front pay, attorney's fees, any and all other damages to which Plaintiff is entitled including interest.

## COUNT III

## (Hostile Work Environment in violation of the Whistleblower Protection Act, 5 U.S.C. 2302(a)(2)(xii))

471.  The foregoing allegations are incorporated as if re-alleged herein.

472.  As set forth in 5 U.S.C. Section 2302(a)(2)(xii), significant changes in duties, responsibilities, or working conditions are prohibited personnel practices.

473.  Hostile work environment claims have been recognized as falling within this section.

474.  Plaintiff filed an informal EEO complaint on November 6, 2017 and a formal EEO complaint thereafter which was amended several times to add additional events that alleged Plaintiff was subjected to harassment and a hostile work environment based on her age (over 40), race (Black), sex (female), and retaliation for engaging in prior EEO activity.

475.  Plaintiff engaged in continuous EEO activity from November 2017 to September 2018 when she was proposed for removal.

476.  For almost a year beginning in October 2017, Plaintiff complained repeatedly of a lack of work within the Procurement Law Group and questioned the Agency's decision to hire additional attorneys for the Procurement Law Group which Plaintiff believed evidenced a gross waste of funds and an abuse of authority.

477.  In May 2018, Plaintiff disclosed information to the VA Office of Inspector General which alleged that the attorneys hired by Mr. Fleck from the Department of the Army to fill GS-15 Trial Attorney vacancies were not performing trial work and instead, were performing the same responsibilities as Plaintiff and other PLG contracts attorneys at the GS-14 level.

478.  Plaintiff believed the information she disclosed to the OIG evidenced a gross waste of funds and an abuse of authority.

479. Plaintiff filed a whistleblower retaliation complaint with the OSC in September 2018 which contained disclosures of information Plaintiff  believed evidenced a gross waste of funds and an abuse of authority.

480.  In retaliation for engaging in EEO and whistleblower activity, Plaintiff's responsibilities, workload and visibility within the Agency were significantly reduced.

481.  Duties and responsibilities once handled by Plaintiff were removed and distributed to younger, mostly Caucasian male attorneys.

482.  In some instances, Plaintiff was required to share work assignments with attorneys junior to her.

483.  In other instances, work that Plaintiff had reviewed was assigned to the GS-15 Army attorneys for further review.

484. Upon information and belief, the Army attorneys were tasked with looking for flaws and/or deficiencies in Plaintiff's work that would support the Agency's claims that Plaintiff's performance was unacceptable.

485. Before the GS-15 attorneys were hired, Plaintiff complained repeatedly that she did not have work and questioned whether there would be enough work for all after the additional attorneys were hired.

486. After the new attorneys were hired, Plaintiff's workload which had already been reduced, was reduced even further, as two and three attorneys were assigned to review a single action that normally required the review of only one attorney.

487. Plaintiff's EEO and OSC complaints alleged that Plaintiff was subjected to a hostile work environment when the Agency did the following: required Plaintiff to email her supervisor each day between November 1, 2017 and December 29, 2017 to state when her workday started, reduced Plaintiff's workload, issued Plaintiff written counseling and admonishment letters, failed to approve Plaintiff's use or lose leave request, gave Plaintiff a negative performance evaluation, denied Plaintiff's request to change her work telework hours, targeted Plaintiff with changes to the Telework Agreement terms, accused Plaintiff of refusing to perform work, singled Plaintiff out during a conference call, excluded Plaintiff from meetings, denied Plaintiff's requests for reassignment, suspended Plaintiff for three days, issued Plaintiff a mid-year progress review feedback document which contained false information, issued a memorandum for record which alleged Plaintiff's conduct was inappropriate, and issued Plaintiff a proposed removal which resulted in her wrongful termination.

488. When Plaintiff appealed her removal, Plaintiff alleged hostile work environment as an affirmative defense.

489. Plaintiff's EEO and whistleblower claims reflect a continuous pattern of discrimination and retaliation against Plaintiff.

490. The harassment and frequency of discriminatory and retaliatory conduct directed at Plaintiff over a one-year period was so severe and pervasive as to alter the conditions of Plaintiff's employment and unreasonably interfere with Plaintiff's work performance, thereby creating a hostile work environment.

491. There is a direct link between Plaintiff's statutorily protected activity and the creation of a hostile work environment.

492. Plaintiff maintains that her whistleblower complaints and disclosures which started on October 30, 2017 and her EEO complaint which was filed on November 6, 2017 against Ms. Cornish and Mr. Fleck caused a barrage of retaliatory and hostile behavior towards her by her superiors which included unwarranted discipline-based and performance-based actions issued to Plaintiff simultaneously, a downgraded performance evaluation, denial of a performance award, a three-day suspension, exclusion from meetings, a denial of Plaintiff's request to change her tour of duty, a failure to approve Plaintiff's use or lose leave request in time for her to start her vacation, and a host of other actions.

493. VA Office of General Counsel managers, including General Counsel James Byrne, and Deputy General Counsels Richard Hipolit and Michael Hogan,

were made aware of the harassment of Plaintiff by her supervisors and the effect the harassment was having on Plaintiff's ability to perform.

494.  Plaintiff informed her superiors on numerous occasions that the harassment was interfering with her ability to perform the duties of her job.

495.  Despite Plaintiff's claims and pleas for assistance and despite Plaintiff's numerous requests to Mr. Hipolit to be transferred, Agency officials took no appropriate remedial actions to stop the frequent harassment and Plaintiff was left to deal on her own with a hostile work environment.

496.  The series of events that occurred when taken as a whole, was sufficiently severe and pervasive such that it altered the conditions of Plaintiff's employment and created a hostile working environment.

497.  There is also a causal connection between Plaintiff's statutorily protected EEO and whistleblower activity and the suffering Plaintiff endured while being forced to remain in a hostile work environment.

498.  As a direct and proximate result of the foregoing violations, Plaintiff suffered damages and injury including lost wages and benefits, injury to her professional and personal reputation, injury to her career and career prospects including opportunities for advancement and promotion, and lost or jeopardized future employment.

499.  Plaintiff demands judgment against Defendants for all damages available by statute and common law including, but not limited to, pain and suffering,

compensatory and enhanced compensatory damages, lost wages, back pay, front pay, attorney's fees, and all other damages to which Plaintiff is entitled including interest.

## COUNT IV

**(Deceipt with Respect to Employee's Right to Compete**

**for Employment in violation of 5 U.S.C. 2302(b)(3) and**

**Granting Preference or Advantage Not Authorized by**

**Law, Rule or Regulation to an Applicant for Employment**

**in violation of 5 U.S.C. 2302(b)(4))**

500.  The foregoing allegations are incorporated as if re-alleged herein.

501.  In her complaints to the OIG and OSC, Plaintiff alleged that the attorneys selected by Mr. Fleck for the position of GS-15 Trial Attorney were granted preferences or advantages not authorized by law for the purpose of improving their prospects for employment and injuring Plaintiff's prospects for employment at the GS-15 level and that Plaintiff was deceived by the trial attorney job announcement which stated the attorneys would be full-time trial attorneys required to travel.

502.  Plaintiff did not submit an application for the positions advertised in December 2016 because Plaintiff was under a doctor's care at the time and was unable to assume full-time trial attorney responsibilities or travel, as required by the job announcement.

503.  The attorneys selected by Mr. Fleck as GS-15 trial attorneys performed little to no trial work.

504.  Instead, they performed the same contracting duties as Plaintiff and other GS-14 attorneys which included litigation on an as needed basis.

505.  Plaintiff was deceived by the job announcement which described the positions being advertised as GS-15 Trial Attorney.

506.  Had the jobs been properly advertised as GS-15 Contracts Attorney which is what they were for the PLG, Plaintiff who was the most senior contracts attorney within the PLG, would have submitted an application for consideration.

507.  By accepting applications from employees from the Department of the Army for the Trial Attorney vacancies advertised under a job announcement that was distributed internally to the Agency's procurement attorneys and intended for Agency attorneys, Mr. Fleck granted preferences and advantages not authorized by law, rule or regulation to those attorneys who previously worked under him at the Army.

508.  By announcing the job openings in December 2016 and not filling the vacancies until almost a year later, the Agency engaged in further deception which obstructed the rights of Plaintiff and others to compete for the jobs which should have been re-advertised.

509.  By not properly advertising the positions and by not selecting any Agency attorneys to fill any of the GS-15 Trial Attorney vacancies for the PLG, the selected Army attorneys were placed over all existing GS-14 PLG attorneys, including Plaintiff.

510.  Given the decrease in Plaintiff's work assignments, Plaintiff continuously questioned the need for additional hires.

511.  Plaintiff also requested that the VA Office of General Counsel review the practices used to hire the GS-15 attorneys for the PLG.

512.  Three GS-15 PLG attorney positions were deactivated after Plaintiff was terminated in October 2018.

513.  Upon information and belief, these were the positions occupied by Mr. Fleck's former employees, Ms. McWilliams, Mr. Bechtel and Mr. Turner.

514.  Upon information and belief, the deactivation of the GS-15 positions was the result of the OIG investigation conducted in response to Plaintiff's May 21, 2018 complaint to the OIG which included allegations that the hiring of the attorneys from the Department of the Army as GS-15 trial attorneys was improper.

515.  Four GS-14 contracts attorney positions were briefly advertised in December 2018 just before Christmas.

516.  Upon information and belief, Ms. McWilliams, Mr. Bechtel and Mr. Turner were placed in three of the four positions advertised.

517.  Upon information and belief, the fourth position advertised was the job previously held by Plaintiff.

518.  GS-15 attorney positions were advertised within the PLG after Plaintiff was terminated.

519.  Upon information and belief, Ms. McWilliams, Mr. Bechtel and Mr. Turner are currently occupying GS-15 positions and/or receiving GS-15 salaries.

520.  Mr. Fleck, a member of the Senior Executive Service, was the subject of an investigation conducted by the Agency Office of Inspector (OIG) General in early 2018 regarding the unlawful hiring of his wife who had previously worked with Mr. Fleck at the Department of the Army.

521.  Mr. Hipolit and Mr. Hogan, both members of the Senior Executive Service within the VA Office of General Counsel, supported the decision to hire Mr. Fleck's wife as an e-Discovery Expert in January 2017.

522.  The OIG stated in its March 29, 2018 report entitled, "Administrative Investigation of Conflict of Interest, Nepotism, and False Statements within the VA Office of General Counsel," that Mr. Fleck had a conflict of interest, engaged in nepotism, improperly shared VA sensitive date, and made false statements.

523.  The charges were considered by the OIG to be so serious that the OIG referred the matter to the Department of Justice for prosecution..

524.  Mr. Fleck's termination was also recommended by the VA Deputy General Counsel of Legal Operations.

525.  Instead of being terminated for advocating for the unlawful employment of his wife from the Department of the Army under a job announcement he helped to craft in order to give her an advantage over the competition, Mr. Fleck, an experienced attorney, was given a letter of warning.

526.  Mr. Fleck's wife was detailed to the Agency's Court of Appeals Law Group.

527.  Upon information and belief, she was later reassigned to the VA Information Law Group to work under the Information Law Group Chief Counsel who sustained the suspension of Plaintiff for three days, Sonja Cromwell.

528.  Mr. Hipolit had responsibility for and oversight over the Information Law Group at the time.

529.  Upon information and belief, the detail of Mr. Fleck's wife was arranged by and/or authorized by Mr. Hipolit and her reassignment to Ms. Cromwell's group was arranged by and/or authorized by Mr. Hogan.

530.  As evidenced by Plaintiff's exemplary work history and the many emails submitted by Plaintiff's clients to her and to Mr. Fleck's supervisor, Mr. Hogan, on behalf of Plaintiff after Plaintiff was proposed for removal, Plaintiff's removal had nothing to do with her performance.

531.  Upon information and belief, the Agency's decision to terminate Plaintiff was motivated by reprisal, stemming from Plaintiff's EEO activity and whistleblower activity which included EEO complaints and complaints to the OIG and OSC which contained information Plaintiff believed evidenced a gross waste of funds and an abuse of authority.

532.  As a direct and proximate result of the foregoing violation, Plaintiff suffered damages and injury including lost wages and benefits, injury to her professional and personal reputation, injury to her career and career prospects including opportunities for advancement and promotion, and lost or jeopardized future employment.

533.  As a direct and proximate result of the foregoing violations, Plaintiff suffered physical harm, emotional distress, personal embarrassment, and humiliation.

534.  Plaintiff demands judgment against Defendants for all damages available by statute and common law including, but not limited to, pain and suffering, compensatory and enhanced compensatory damages, lost wages, back pay, front pay, attorneys fees, any and all other damages to which Plaintiff is entitled including interest.

## COUNT V

## (Harmful Procedural Error in Violation of the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, P.L. No. 115-41 (6/23/17) and the Whistleblower Protection Act, 5 U.S.C. 2302(b)(8) and (9))

535.  The foregoing allegations are incorporated as if re-alleged herein.

536.  S.1094 - Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, P.L. No 115-41 (6/23/17) states on page 131 STAT. 872(e), "In the case of a covered individual seeking corrective action (or on behalf of whom corrective action is sought) from the Office of Special Counsel based on an alleged prohibited personnel practice described in Section 2302(b) of title 5, the Secretary may not remove, demote or suspend such covered individual under subsection (a) without the approval of the Special Counsel under Section 1214(f) of title 5."

537. A letter sent by the VA Secretary to Senator Tammy Baldwin on June 1, 2018 stated, "... VA will also hold making a decision on a pending proposed action, per

38 U.S.C. Section 714(e), if an employee informs the deciding official that he or she has a pending complaint before the U.S. Office of Special Counsel or has an open disclosure with VA's Office of Accountability and Whistleblower Protection."

538.  When Plaintiff responded to the September 11, 2018 Notice of Proposed Removal issued to her by Ms. Cornish, Plaintiff informed the Agency and deciding official, Mr. Fleck, that she had filed a complaint with the OSC.

539.  Although the Agency claimed it received the approval of the Special Counsel to proceed with the removal of Plaintiff, the Agency proffered no evidence to support its claim.

540.  The information provided by the Agency showed only that the Agency's Office of Accountability and Whistleblower Protection (OAWP) with whom Plaintiff had a pending complaint, contacted the OSC at the request of VA opposing counsel Danielle Kalivoda, and the OSC stated it could not confirm or deny that it had a complaint from Plaintiff.

541.  Upon information and belief, the Agency did not follow its own written guidance and did not receive the requisite approval of the Special Counsel before terminating Plaintiff.

542.  This procedural error was harmful to Plaintiff, as it left Plaintiff without employment or employment income.

543.  Upon information and belief, it was inappropriate and a conflict of interest for the OAWP to contact OSC on behalf of the VA Office of General Counsel which was responsible for Plaintiff's termination.

544.  Upon information and belief, the Agency's action in moving forward with Plaintiff's termination without the approval of the OSC was reprisal motivated by Plaintiff's EEO and whistleblower activity which is a violation of the Whistleblower Protection Act, 5 U.S.C. 2302(b)(8) and (9).

545.  Plaintiff maintains the Agency would not have terminated Plaintiff in the absence of the discriminatory and retaliatory motives that contributed in this instance to Plaintiff's removal.

546.  Upon information and belief, the Agency cannot show it would have taken the same action in the absence of such discriminatory or retaliatory motives.

547.  As a direct and proximate result of the foregoing violations, Plaintiff suffered damages and injury including lost wages and benefits, injury to her professional and personal reputation, injury to her career and career prospects including opportunities for advancement and promotion, and lost or jeopardized future employment.

548.  As a direct and proximate result of the foregoing violations, Plaintiff suffered physical harm, emotional distress, personal embarrassment, and humiliation.

549.  Plaintiff demands judgment against Defendants for all damages available by statute and common law including, but not limited to, pain and suffering, compensatory and enhanced compensatory damages, lost wages, back pay, front pay, attorneys fees, any and all other damages to which Plaintiff is entitled including interest.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff against Defendants and award Plaintiff the following relief:

1. rescission of the adverse action (removal) and an order reinstating Plaintiff;

2. expunction of all references to the adverse action from all files including, but not limited to, Agency files and Office of Personnel Management files;

3. back pay, front pay, benefits, and interest;

4. compensatory and non-pecuniary damages;

5. punitive damages;

6. reasonable attorney's fees and costs; and

7. other such relief as the Court may deem just and proper.

Dated:  June 28, 2019                                    Respectfully Submitted,


Jo Spence, *pro se*
710 Belmont Bay Drive
Woodbridge, VA 22191
(571) 288-6092
jodspence@aol.com

97

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ) | |
| JO SPENCE ) | |
| 710 Belmont Bay Drive ) | |
| Woodbridge, VA 22191 ) | |
| (571) 288-6092(c), ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| VETERANS AFFAIRS, ) | |
| 810 Vermont Avenue, N.W. ) | |
| Washington, DC  20420; and ) | |
| ) | |
| ROBERT WILKIE, in his official capacity as ) | |
| Secretary of the United States ) | |
| Department of Veterans Affairs, ) | |
| 810 Vermont Avenue, N.W. ) | |
| Washington, DC  20420, ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**CERTIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.  Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have